[Cite as *State v. Lewis*, 2011-Ohio-1411.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                              :

    Plaintiff-Appellee                  :          C.A. CASE NO. 23850

v.                                        :          T.C. NO.    09 CR 1716/01

THERON E. LEWIS              :          (Criminal appeal from
                                      Common Pleas Court)

    Defendant-Appellant              :

                                              :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___25th___ day of ___March___, 2011.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560 and LAURA M. WOODRUFF, Atty. Reg. No. 0084161, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorneys for Plaintiff-Appellee

DARRELL L. HECKMAN, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Theron Lewis was convicted after a jury trial in the Montgomery County Court of Common Pleas of two counts of murder with a firearm specification, two counts of felonious assault with a firearm specification, and one count of having weapons while under

disability. All of the counts stemmed from the shooting of Isaac Gibson. The murder counts were merged, and Lewis was sentenced to an aggregate term of twenty-eight years to life.

{¶ 2} Lewis appeals from his convictions and sentence. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for resentencing.

I

{¶ 3} During the afternoon of April 25, 2009, after the funeral of Thomas ("Tom Tom") Watson, a 25-year-old murder victim, several hundred people gathered in and outside the home of Altheadore Watson at 1809 West Riverview Avenue in Dayton. The residence was a few houses west of the corner of West Riverview and North Euclid Avenue, and an alley ran behind West Riverview homes. The majority of the mourners congregated outside in the alley, along North Euclid, and near the West Riverview and North Euclid intersection. Among the mourners were Isaac ("Quan") Gibson; Gibson's father, Anthony ("Tink") Snowden, Sr.; Gibson's brother, Anthony ("Man Man") Snowden, Jr.; and Gibson's cousin, Michelle Thomason. Also present were Fabian ("Fabo") Gentry; Keith Watson, Gibson's cousin by adoption; Benjamin ("Bennie") Faircloth; and Theron ("T-Streets") Lewis.

{¶ 4} The sequence of events leading to the shooting of Isaac Gibson is somewhat unclear. However, at some point before 7:00 p.m., an altercation began between Gibson, on one side, and Gentry and Faircloth, on the other. Upon being told of the fight, Snowden, Sr., Thomason, and Snowden, Jr. each went to the commotion. The Snowdens advised Gibson to leave, and they attempted to guide Gibson toward his vehicle, which was parked

along the alley behind 1809 West Riverview. As the fight resumed between Gibson and Faircloth, Keith Watson retrieved a semiautomatic weapon – which Thomason, and the Snowdens described as likely a 9mm, .40 caliber, or .45 caliber – and attempted to hit Gibson with it. Anthony Snowden, Sr. intercepted Watson and grabbed Watson's arm. Watson fired his weapon into the ground.

{¶ 5} Almost immediately thereafter, Lewis pointed a small revolver (which Thomason described as a .38 caliber weapon) at Gibson and shot him in the left upper abdomen. Gibson collapsed against the car and fell to the ground. Thomason, a bouncer at a bar, grabbed Lewis and threw him against a fence; Lewis dropped his weapon. Thomason, along with the Snowdens and someone named Rhonda, ran to Gibson.

{¶ 6} At approximately 7:00 p.m., Dayton police officers were dispatched to 800 North Euclid on a report of a shooting. Paramedics transported Gibson to Miami Valley Hospital, where he was reported dead. Thomason had left before the police arrived, and Snowden, Sr. left after Gibson was removed to the hospital. No one at the scene – including Snowden, Jr., who was questioned at the Safety Building that evening – identified Gibson's shooter to the police. The police recovered one .40 caliber Smith & Wesson bullet casing from the alley. The Montgomery County Coroner's Office recovered a .38 caliber bullet from Gibson's spine.

{¶ 7} On May 13, 2009, Thomason, Snowden, Jr., and Snowden, Sr. provided statements to Detective Gaier about the shooting. Thomason and Snowden, Jr. identified Lewis as Gibson's shooter. All three testified that they did not immediately talk to the police, because they were considering retaliation against Lewis themselves, i.e., killing him.

{¶ 8} After a trial, a jury convicted Lewis of two counts of murder, two counts of felonious assault, and having weapons while under disability. The trial court sentenced Lewis to five years for each of the felonious assault counts, to be served concurrently; fifteen years to life for both murder counts, to be served consecutively to the felonious assault counts; five years for having weapons while under disability, to be served consecutively to the other counts; and three years of actual incarceration for the firearm specifications (which were merged), to be served consecutively to and prior to the other terms of imprisonment. The court merged the two murder counts and all of the firearm specifications. Lewis's aggregate sentence was 28 years to life.

{¶ 9} Lewis appeals, raising seven assignments of error.

II

{¶ 10} Lewis's first assignment of error states:

{¶ 11} "THE JUDGMENT OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 12} In his first assignment of error, Lewis claims that his convictions were against the manifest weight of the evidence.

{¶ 13} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, Montgomery App. No. 22581, 2009-Ohio-525, ¶12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving

conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175; *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶44.

{¶ 14} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

{¶ 15} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 16} Lewis argues that the Snowdens' and Thomason's testimony was not credible and that their testimony was not entitled to any weight. He emphasizes that there was no physical evidence tying him to the murder, that there was no evidence of a motive for the shooting, and that all three witnesses contemplated killing him in retaliation for the shooting.

{¶ 17} Upon review of the record, we cannot conclude that the jury "lost its way" when it convicted Lewis. It is true that there were discrepancies between Thomason's and the Snowdens' testimony. For example, the testimony varied as to whether Keith Watson retrieved a gun from his truck or from his pocket, whether Watson fired one or two shots into the ground, who walked Gibson toward his car, when Watson tried to hit Gibson with a

gun, and the age of the children who looked for Lewis's weapon after the shooting, among other things. In addition, the jury could have reasonably questioned why these three witnesses, allegedly without conferring with each other, elected to speak with Detective Gaier on the same date more than two weeks after the shooting

{¶ 18} Nevertheless, Thomason's and the Snowdens' testimony regarding the overall events was generally consistent: A fight broke out between Gibson and Gentry and Faircloth, Gibson was ushered to his car, the fight resumed, Watson obtained a semiautomatic gun and shot it into the ground while Snowden, Sr. tried to restrain him, and Lewis pointed a revolver at Gibson and shot him. The bullet retrieved from Gibson's spine was a different caliber than the shell casing discovered at the scene, which corroborated the witnesses' testimony that two different guns were fired there. And, the fact that the police did not find a .38 caliber shell casing supported the testimony that Gibson had been shot with a revolver, which would not have ejected the empty casing. The jury did not act unreasonably when it apparently chose to believe the testimony that Lewis had shot Gibson.

{¶ 19} Lewis's first assignment of error is overruled.

III

{¶ 20} Lewis's second assignment of error states:

{¶ 21} "THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AS THE RECORDING SYSTEM IN USE LEFT SERIOUS GAPS IN THE TRANSCRIPT."

{¶ 22} In his second assignment of error, Lewis claims that his right to due process was violated, because there were numerous areas in the trial transcript that were "indiscernible" and, consequently, the transcript is incomplete. Lewis states: "It is

unreasonable and a denial of Due Process of Law to require appellant to prove what evidence convicted him. The State hires the Prosecutor, the Judge, the court reporters and legal assistants. In a homicide case the State should be required to make a complete transcript. *** Where there is a structural decision by a court not to use a means of recording reasonably calculated to give a full transcript, the court has committed reversible error." Lewis clarifies in his reply brief that he believes that the court's use of a video recording system, in lieu of a court reporter, constitutes structural error, which requires no proof of prejudice.

{¶ 23} "The significance of structural error, compared and contrasted with plain error, is laid out in *Johnson v. U.S.* (1997), 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718. Plain error is error that was not brought to the attention of the trial court, but which is both sufficiently plain and sufficiently prejudicial as to merit reversal on appeal despite the fact that it was not brought to the attention of the trial court. Structural error is error that affects the entire structural framework of the proceedings to such an extent that harmless-error analysis is inappropriate; i.e., prejudice is presumed. Id., at 468. Of course, an error might satisfy both tests, so that the error would be both plain and structural." *State v. Ealy*, Montgomery App. No. 23391, 2010-Ohio-4531, ¶38.

{¶ 24} While our review of the trial transcript has revealed multiple places where the record is indecipherable (Lewis says there are 84 such instances), particularly during jury selection and bench conferences, the deficiencies in the transcript as a whole are not so egregious or confusing so as constitute structural error in the trial or prevent appellate review. And, although some of the side bar discussions were completely inaudible, Lewis

has not identified any particular portion of the transcript where the "indiscernible" speech prevented him from establishing prejudicial error.

**{¶ 25}** Lewis's appellate counsel argued before us that the General Division's decision to use electronic recording, rather than a court reporter, removed the human element from the recordation of the record and resulted in this case (and will result in future cases) in an inability to produce a record on appeal that manifests all of the errors that were present.

**{¶ 26}** We are not unaware that the nonproduction of the appellate record, which is not caused by the defendant's misconduct, may require reversal of the underlying conviction.[1] *State v. Jones* (1994), 71 Ohio St.3d 293, 297. See, also, e.g., *Perez v. State* (Tex.Crim.App., 1992), 824 S.W.2d 565; *State v. Osman* (Wash., 2010), 229 P.3d 729; *Bellows v. State* (Nev., 1994), 871 P.2d 340, 342. However, a defendant may only be entitled to a new trial "if, after all reasonable solutions are exhausted, an appellate record could not be complied." *Jones*, 71 Ohio St.3d at 298. See, also, e.g., *Commonwealth v. Harris* (Mass., 1978), 379 N.E.2d 1073.

**{¶ 27}** The burden was on Lewis to provide a complete record, and "[i]t is well settled that when transcripts contain inaudible portions or omissions, a defendant must attempt to reconstruct the trial record on appeal, through App.R. 9(E) [or] otherwise, and demonstrate prejudice resulting from the incompleteness." *State v. Arment*, Montgomery App. No. 19459, 2003-Ohio-4089, ¶39 (addressing a transcript with inaudible portions when the trial was conducted in a courtroom with recording equipment rather than a court

---

[1] Some states even incorporate the "impossibility of making a record" as a specific ground for a new trial. See, e.g., Tex.R.App.P. 34.6(f); Wash.R.App.L.J. 5.4 (Loss or Damage of Electronic Record).

reporter).

{¶ 28} App.R. 9 provides a process by which a statement of the evidence may be created to cure the defect of the lack of an entire transcript, let alone individual defects. This is one of the "reasonable solutions" referred to in *Jones*. *Chardon v. Bulman*, Geauga App. No. 2007-G-2811, 2008-Ohio-6769, ¶76. Specifically, App. R. 9(E) provides for procedures to be followed to correct or modify the record if anything material is omitted from the record by error or accident. And, pursuant to App. R. 9(C), Lewis's counsel could have prepared a statement of the indiscernible portions of the transcript "from the best available means, including the appellant's recollection," and submitted the statement to the trial court in order to settle any objections from the opposing party. See *State v. Thompson*, Montgomery App. No. 22984, 2010-Ohio-1680, ¶235. In the alternative, Lewis could have sought, with input from the State, an agreed statement regarding the indiscernible portions of the record. Id.

{¶ 29} Moreover, the problems complained of by Lewis are certainly not unique to an audio and/or video recording system. In fact, the *Jones* case involved the destruction of notes of a court reporter. Similarly, in *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, the court reporter's notes from the trial were not transcribed due to the court reporter's extended illness. None of this is to understate the initial responsibility of all those involved in a trial – judge, judicial assistant/court reporter, prosecutor, and defense attorney – to ensure that a record exists for an appellate court to review.

{¶ 30} The second assignment of error is overruled.

IV

{¶ 31} "THE TRIAL COURT ERRED IN FAILING TO PROTECT DEFENDANT FROM PROSECUTORIAL MISCONDUCT."

{¶ 32} In his third assignment of error, Lewis contends that the State engaged in prosecutorial misconduct on four occasions.

{¶ 33} In reviewing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 2000-Ohio-187. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, overruled on other grounds. We review the alleged wrongful conduct in the context of the entire trial. *State v. Stevenson*, Greene App. No. 2007-CA-51, 2008-Ohio-2900, ¶42, citing *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.

{¶ 34} First, Lewis challenges the prosecutor's statements to prospective jurors during voir dire concerning the firearm specifications. Specifically, the prosecutor stated:

{¶ 35} "MR. FRANCESCHELLI: *** Does everyone [under]stand that? So you'll have to make a finding – if you find the defendant is guilty of those charges, you'll also make a finding whether or not he used a firearm. It's that simple. Okay? Anyone here who doesn't understand that?

{¶ 36} "PROSPECTIVE JURORS: No (in unison).

{¶ 37} "MR. FRANCESCHELLI: Now, I share that with you to ask you this question: Do you recognize that the people do not have to bring the firearm into the courtroom?  Anyone here who doesn't get that?  Think about that for a second.  The people, we don't have to bring the firearm into the courtroom.  If a person used the firearm and shot someone, we don't have to bring the firearm to prove firearm specification. Anyone here confused by that or doesn't understand that?  Just raise your hand.

{¶ 38} "PROSPECTIVE JURORS: (No audible response.)

{¶ 39} "MR. FRANCESCHELLI: Okay.  *And the reason is, obviously, we don't reward people for shooting someone and getting rid of a firearm.*

{¶ 40} "MR. CALAWAY: Objection.

{¶ 41} "MR. FRANCESCHELLI: It's that simple.

{¶ 42} "THE COURT: All right.  I'm going to overrule it, but that's as far as you're going."  (Tr. 41-42.) (Emphasis added).

{¶ 43} Lewis asserts that the prosecutor's statement was "an attempt to lessen the burden of proof and blame the defendant for the State's lack of evidence."  The State responds that the prosecutor had addressed the burden of proof during voir dire (as did the trial court in its instructions), leaving no doubt that the State was required to prove its case beyond a reasonable doubt.  The State further argues that it could, in fact, prove the firearm specification without producing the weapon, and there is evidence that Lewis "concealed or destroyed" the firearm because it was not found at the scene of the shooting.

{¶ 44} As an initial matter, we do not interpret the prosecutor's statement as an attempt to reduce its burden of proof.  And, the jury was repeatedly informed that the State

was required to prove its case beyond a reasonable doubt.

{¶ 45} In addition, as acknowledged by Lewis, the State correctly asserts – and the prosecutor correctly stated during voir dire – that the prosecution was not required to produce the weapon in order to prove the firearm specifications. Circumstantial evidence and direct evidence have equivalent probative value. *State v. Jenks* (1991), 61 Ohio St.3d 259, 272, superseded on other grounds by constitutional amendment as stated in *State v. Smith* (1997), 80 Ohio St.3d 89; *State v. Reynolds*, Montgomery App. No. 19780, 2003-Ohio-7245, ¶17. Consequently, the State could prove the firearm specification solely on the basis of circumstantial evidence; the prosecutor could have reasonably informed the prospective jurors of that fact. See *State v. Nicely* (1988), 39 Ohio St.3d 147, 151.

{¶ 46} However, the prosecutor's proffered reason for not requiring the weapon to be produced, i.e., that "we don't reward people for shooting someone and getting rid of a firearm," was objectionable. Lewis was not charged with tampering with evidence, and no evidence was submitted at trial to support the contention that Lewis "got rid of" or "concealed or destroyed" the firearm. The mere fact that the gun was not recovered at the scene is insufficient to establish tampering with evidence. *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, ¶24 (the absence of a weapon at the scene of a shooting and defendant's own statements that he "threw the gun away" were insufficient to establish tampering with evidence). Nevertheless, in this case, the felonious assault and murder offenses arose out of the shooting death of Gibson; there was overwhelming evidence that an operable firearm was used in the commission of the offenses. Accordingly, we find the prosecutor's statements to be harmless beyond a reasonable doubt.

{¶ 47} Lewis also challenges various statements and questions by the prosecutor, which allegedly were intended to appeal to the passions of the jury. We will address them together.

{¶ 48} A prosecutor may not make statements that are "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." *State v. Williams* (1986), 23 Ohio St.3d 16, 20. "Where it appears that prosecutorial comments constituted an invitation to the jury to go beyond the evidence or were so flagrant as to incite the passions or prejudice of the jury, and thereby deny the accused a fair trial, prejudicial error may inhere." *State v. Slagle* (June 14, 1990), Cuyahoga App. No. 55759, citing *State v. Price* (1979), 60 Ohio St.2d 136, 140.

{¶ 49} Lewis challenges the prosecutor's comments during opening and closing arguments that these "senseless killings" are "all too common," that killings have occurred "over and over," and that Gibson's death was "another statistic in Dayton, Ohio." He also claims that the prosecutor's statements during opening statement and closing argument that "this stops here" was an appeal to the community to stop crime, rather than determine Lewis's guilt based on the evidence. Specifically, the prosecutor concluded his opening statement, saying:

{¶ 50} "This was a senseless killing, ladies and gentleman. It was a horrible tragedy. Again, all too common. This stops here. We are confident that you will return a verdict of guilty on all charges."

{¶ 51} Similarly, the same prosecutor concluded his closing argument, stating:

{¶ 52} "Ladies and gentlemen of the jury, you have in your hands the opportunity to

hold this defendant accountable for his actions, accountable for shooting another human being, taking his life. This stops here.

{¶ 53} "We are confident you will return a verdict of guilty on all charges."

{¶ 54} Defense counsel did not object to the prosecutor's comments. Accordingly, we review them for plain error. Plain error may be noticed if a manifest injustice is demonstrated. Crim.R. 52(B); *State v. Herrera*, Ottawa App. No. OT-05-039, 2006-Ohio-3053. In order to find a manifest miscarriage of justice, it must appear from the record as a whole that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91.

{¶ 55} In this case, Gibson's murder occurred following the funeral for another young man who had been murdered. In addition, Thomason and Snowden, Jr. both testified that they had planned on "retaliating" for Gibson's death. By commenting that such murders are "all too common," the prosecutor may have been commenting, in general terms, on the context in which Gibson's death occurred. On the other hand, whether murder is statistically common is not relevant to whether the evidence proves beyond a reasonable doubt that a particular defendant murdered a particular victim.

{¶ 56} The State asserts that "this stops here" meant that "a finding of guilt would stop Theron Lewis from committing any more crimes." It is questionable whether the jury would have interpreted the prosecutor's statements as such. Rather, it is just as plausible that the jury interpreted "this stops here" as a call to help stop the crime spree in Dayton by convicting Lewis. Indeed, Thomason and Snowden, Jr. had both indicated a desire to retaliate against Lewis for the murder; the prosecutor's remarks could have been construed

as a warning that Gibson's family might murder Lewis if the jury did not convict him, or that the jury, as a voice of the community, must send a message that violence – such as the death of Thomas Watson, the shooting of Gibson at Watson's funeral, and the contemplated retaliation against that shooting – must "stop here." Accordingly, the prosecutor's statement arguably asked the jury to go beyond the evidence and convict Lewis to "stop" the "all too common" murders in Dayton and out of fear of another one if Lewis were not convicted.

{¶ 57} Lewis also claims that the prosecutor engaged in misconduct when he asked Thomason the following question during redirect examination: "Tell this jury what it was like when Isaac was shot by that defendant and you had to hold him in your arms as he died in your arms. Tell that jury what that was like." Defense counsel also did not object to this question.

{¶ 58} Lewis claims that the prosecutor's question was asked "solely to arouse the sympathy of the jury and is highly improper." The State responds that the question was relevant and was asked in response to cross-examination about Thomason's failure to immediately report what she knew about Gibson's murder to the police.

{¶ 59} The prosecutor's question about how Thomason felt to have Gibson die in her arms did not ask Thomason to explain why she failed to promptly go to the police with information about Gibson's death, and it would not have reasonably elicited such a response. Defense counsel's cross-examination about Thomason's failure to immediately talk with the police did not open the door to questions about her feelings while Gibson was dying. In short, the prosecutor's question was not relevant to any issue in the case, and it was

apparently intended to play on the sympathy of the jury. The question was therefore improper.

{¶ 60} In order for the prosecutor's improper statements and question to rise to the level of prosecutorial misconduct, the conduct must have been prejudicial to Lewis. Viewing the prosecutor's opening statement, closing argument, and questioning in the context of the entire trial, we do not conclude that the prosecutor's improper conduct affected the outcome of Lewis's trial. Two eyewitnesses, who were standing in close proximity to Lewis at the time of the shooting, testified that they saw Lewis shoot Gibson with a revolver. The State detailed the evidence against Lewis in its opening statement, closing argument, and rebuttal closing argument, and repeatedly urged the jury to hold Lewis accountable for his actions. The trial court instructed the jury that counsel's arguments were not evidence, and that the jury was to decide the case solely on the evidence presented. We do not find the prosecutor's statements to be so egregious that the jury would likely have disregarded the trial court's instructions. The prosecutor's statements and his improper question to Thomason did not constitute plain error.

{¶ 61} Lewis's third assignment of error is overruled.

V

{¶ 62} Lewis's fourth assignment of error states:

{¶ 63} "THE TRIAL COURT ERRED IN FAILING TO CONDUCT A *BATSON* HEARING."

{¶ 64} In his fourth assignment of error, Lewis claims that the trial court erred in not conducting a *Batson* hearing upon the State's use of a peremptory challenge against a

minority prospective juror.

{¶ 65} During jury selection in chambers, the following exchange occurred:

{¶ 66} "THE COURT: *** Okay, now, the State has four challenges. Do you wish to exercise the first?

{¶ 67} "MR. FRANCESCHELLI: Yes, Your Honor, with your permission, we'll excuse Potential Juror #11.

{¶ 68} "THE COURT: Number 11, [name of juror]. Any objection?

{¶ 69} "MR. CALAWAY: No, Your Honor.

{¶ 70} "THE COURT: All right. And then that's just based on *Batson* and ask for an objection with regard to that.

{¶ 71} "MR. CALAWAY: Well, I was under the impression with *Batson* we had to clear all of the jurors of a certain race out before I could make a *Batson* –

{¶ 72} "THE COURT: Okay.

{¶ 73} "MR. CALAWAY: – (indiscernible – simultaneous speech), Your Honor.

{¶ 74} "THE COURT: All right. Very well. All right, so [the juror] is excused."

{¶ 75} In *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court held that the Equal Protection Clause forbids the State from exercising a peremptory challenge to excuse a juror solely because of that juror's race. See *State v. Murphy*, 91 Ohio St.3d 516, 2001-Ohio-112 (applying *Batson*). "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors[ .]" *Batson*, 476 U.S. at 86 (citations

omitted).

{¶ 76} The Supreme Court has set forth a three-step inquiry when the State's peremptory challenge has been challenged under *Batson*. First, the defendant must set forth a prima facie case of discrimination. To establish a prima facie case of discrimination, "the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race." *State v. Carver*, Montgomery App. No. 21328, 2008-Ohio-4631, ¶48, citing *Batson*, 476 U.S. at 95. If that occurs, the prosecutor must state a race-neutral explanation for striking the juror in question. If the prosecutor provides an explanation, the trial court must determine whether the defendant met his burden of proving intentional discrimination or whether the prosecutor's explanation was a pretext.

{¶ 77} If a party fails to contest a peremptory challenge under *Batson*, that issue is waived, except for plain error. *Stewart v. Nazir*, Montgomery App. No. 23806, 2010-Ohio-6346, ¶25. "The reason for application of waiver is that failure to object deprives the opposing party of the ability to provide a race-neutral explanation for the peremptory challenge." Id., citing *State v. Ballew*, 76 Ohio St.3d 244, 253, 1996-Ohio-81.

{¶ 78} In the absence of the objection, the trial court has no "blanket obligation" to conduct an inquiry under *Batson*. *Stewart* at ¶28. As we stated in *Stewart*:

{¶ 79} "*** While trial judges are responsible for supervising trial proceedings, adopting a blanket obligation [to conduct a *Batson* hearing] imposes an unreasonable burden on trial courts that is not warranted by the case law. If the Supreme Court of the United States or the Supreme Court of Ohio intended to impose that burden, these courts would not

require parties to oppose a peremptory challenge and to establish a prima facie case; instead, the courts would impose the necessity of holding a *Batson* inquiry every time jurors of a constitutionally cognizable group are removed.

{¶ 80} "Furthermore, in the absence of a *Batson* objection, there is no way to determine whether the party adverse to the party exercising the peremptory challenge is opposed to its exercise. For all the trial and appellate courts would know, that party might be breathing a sigh of relief that the other party had used one of its peremptory challenges to excuse a potential juror whom both parties regard as unsuitable, thereby permitting the first party to save its peremptory challenge to deploy against some other potential juror.

{¶ 81} "We have routinely required the opposing party to timely object to the use of peremptory challenges. ***" Id. at ¶28-30.

{¶ 82} Lewis's counsel failed to object to the State's use of a peremptory challenge to excuse the juror in question, and he declined to object when the court expressly asked him if he wished to do so. Although counsel's reason for not objecting was based on a misunderstanding of the law,[2] the court was under no obligation to require counsel to make a *Batson* challenge or to conduct a *Batson* inquiry in the absence of an objection, particularly when nothing in the record (other than, inferentially, the juror's race) suggested that the State was motivated by race in excusing the prospective juror from the jury.

{¶ 83} The fourth assignment of error is overruled.

---

[2] Counsel apparently believed that there needed to be a pattern of discrimination before a *Batson* challenge could be made. However, "[t]he existence of a pattern of potentially discriminatory strikes, while relevant, is not necessary to establish either a prima facie case under *Batson* or to establish an actual violation." *State v. Russell*, Montgomery App. No. 23454, 2010-Ohio-4765, ¶20 (citations omitted).

VI

{¶ 84} Lewis's fifth assignment of error states:

{¶ 85} "THE TRIAL COURT ERRED IN DENYING DEFENDANT EFFECTIVE CROSS EXAMINATION OF A CRUCIAL DEFENSE WITNESS."

{¶ 86} In his fifth assignment of error, Lewis claims that the trial court erred in denying him the opportunity to cross-examine Thomason about her past criminal behavior, particularly a charge of burglary.[3]  Lewis argues that the facts underlying the burglary were probative of untruthfulness and, therefore, that evidence was relevant to undermine Thomason's credibility.

{¶ 87} During defense counsel's cross-examination of Thomason, counsel attempted to ask Thomason about her past criminal convictions, as follows:

{¶ 88} "Q: Okay.  Let's go back in your past and also, were you ever convicted of aggravated burglary?

{¶ 89} "A: Yes, but it dropped when I completed my TLC.

{¶ 90} "Q: Your intervention in lieu of conviction?

{¶ 91} "A: Yes.

{¶ 92} "Q: Okay.  And that's the same thing as with the possession of cocaine?"

{¶ 93} At this juncture, the State objected, and a lengthy sidebar discussion was conducted.  Although the transcript of this discussion is partially "indiscernible," the prosecutor apparently asserted that Thomason had no felony convictions due to her

---

[3]At trial, defense counsel asked Thomason about an aggravated burglary conviction.    The State asserts that the charge was for burglary, not aggravated burglary, and, on appeal, Lewis refers to the charge as burglary.

successful completion of ILC and, accordingly, defense counsel could not inquire about Thomason's burglary and cocaine charges. Defense counsel apparently responded that he was allowed to inquire into a felony conviction and to confront Thomason with the certified entry if she denied having the conviction. Defense counsel indicated that his LEADS printout did not show that the charges had been dismissed or that ILC had been completed successfully.

{¶ 94} At the conclusion of the discussion, the trial court sustained the objection citing the evidence rule concerning impeachment upon evidence of conviction of crime, which is Evid.R. 609. The court informed the jury that, "[u]nder the Rules of Evidence, [ILC] is the equivalent of an expungement; and so, therefore, she has no conviction if it's successful, and we've made that determination. So she has no conviction, and that cannot be brought up. So, in your deliberations, you cannot use – if you remember that or whatever, that cannot be used as part of the deliberation."

{¶ 95} Lewis agrees that the trial court's ruling under Evid.R. 609 was "unobjectionable." He claims, however, that he should have been permitted to discuss the underlying facts of the burglary offense under Evid.R. 608, which addresses the use of specific instances of conduct to attack or support a witness's character for truthfulness. Lewis argues that he was not seeking to have Thomason's conviction introduced, but rather to demonstrate that she committed acts which constituted a crime and that her credibility should be questioned.

{¶ 96} We see no indication in the record that Lewis relied upon Evid.R. 608 during the sidebar discussion. Because he failed to object at trial on the specific ground raised

here, Lewis has waived all but plain error. See *State v. Tibbetts*, 92 Ohio St.3d 146, 161, 2001-Ohio-132.

{¶ 97} The admission or exclusion of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Malloy*, Clark App. No. 09 CA 92, 2011-Ohio-30, ¶64, citing *State v. Sage* (1987), 31 Ohio St.3d 173.

{¶ 98} The Ohio Rules of Evidence clearly delineate the methods by which a party may impeach a witness's credibility. *State v. Hurt*, 158 Ohio App.3d 671, 2004-Ohio-4266, ¶11, quoting *State v. Rodriguez* (1986), 31 Ohio App.3d 174, 176. A witness's credibility may be attacked, under Evid.R. 609, by evidence that the witness has been convicted of a crime, or under Evid.R. 608, by evidence of the witness's character for untruthfulness. Id.

{¶ 99} Evidence Rule 608(B) states in relevant part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness ***."

{¶ 100} Even assuming that evidence that Thomason participated in a burglary related to her character for truthfulness, we cannot conclude such evidence would have affected the outcome of the trial. Just prior to defense counsel's asking Thomason about her criminal record, Thomason testified that she had been a member of a gang, the Gangster Disciples; Thomason stated that she could not say what she did in the gang, because "I didn't

do nothing." Thomason had previously testified during the State's direct examination that she had contemplated retaliating against Lewis for Gibson's shooting. On recross examination, Thomason clarified that she had considered murdering Lewis. In light of this testimony, the additional information that Thomason had been involved in a burglary would likely have had minimal impact on the jury and would not have affected the outcome of the trial.

{¶ 101} The fifth assignment of error is overruled.

VII

{¶ 102} Lewis's sixth assignment of error states:

{¶ 103} "THE TRIAL COURT ERRED IN SENTENCING DEFENDANT ON MORE THAN ONE OF THE FIRST FOUR COUNTS OF THE INDICTMENT."

{¶ 104} In his sixth assignment of error, Lewis claims that the trial court should have merged his felonious assault convictions with his murder convictions. The State acknowledges that we have previously held that felonious assault is an allied offense of similar import with the crime of felony murder predicated upon felonious assault, e.g., *State v. Reid*, Montgomery App. No. 23409, 2010-Ohio-1686, and *State v. Scandrick*, Montgomery App. No. 23406, 2010-Ohio-2270, but asks that we reconsider our prior holding.

{¶ 105} R.C. 2941.25, concerning allied offenses of similar import, provides:

{¶ 106} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 107} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 108} "R.C. 2941.25 codifies the double jeopardy protections in the federal and Ohio constitutions, which prohibit courts from imposing cumulative or multiple punishments for the same criminal conduct unless the legislature has expressed an intent to impose them. R.C. 2941.25 expresses the legislature's intent to prohibit multiple convictions for offenses which are allied offenses of similar import per paragraph (A) of that section, unless the conditions of paragraph (B) are also satisfied." *State v. Barker*, 183 Ohio App.3d 414, 2009-Ohio-3511, ¶22, citing *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, overruled on other grounds by *State v. Johnson*, __ Ohio St.3d __, 2010-Ohio-6314.

{¶ 109} In *Johnson*, the Ohio Supreme Court recently clarified the process by which courts determine whether offenses are allied offenses of similar import. The *Johnson* court overruled *Rance* "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25." *Johnson* at ¶44. Now, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id.

{¶ 110} *Johnson* states that "the intent of the General Assembly is controlling." Id. at ¶46. "We determine the General Assembly's intent by applying R.C. 2941.25, which

expressly instructs courts to consider the offenses at issue in light of the defendant's conduct." Id. The trial court must determine prior to sentencing whether the offenses were committed by the same conduct. The court no longer must perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger. Id. at ¶47 "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." Id. at ¶48 (internal citation omitted).

{¶ 111} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" Id. at ¶49 (citation omitted). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." Id. at ¶50. "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶51.

{¶ 112} Under the facts of this case, it is apparent that the charges of felonious assault are allied offenses of similar import, both with each other and with the murder charges. Lewis fired a single bullet at Gibson, killing him. Stated differently, Lewis used a deadly weapon and caused serious physical harm, namely death; he could not have

committed felony murder premised on these felonious assaults without having committed the felonious assaults. In short, Lewis committed a single act with a single state of mind, and the two felonious assault counts should have been merged with the remaining count of murder.

{¶ 113} Where two or more offenses must be merged as allied offenses of similar import, the prosecutor must elect which offense it will pursue. *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, ¶21-23. "If, upon appeal, a court of appeals finds reversible error in the imposition of multiple punishments for allied offenses, the court must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶25. The Supreme Court has provided additional guidance to the trial court, as follows:

{¶ 114} "On remand, the trial court should fulfill its duty in merging the offenses for purposes of sentencing, but remain cognizant that R.C. 2941.25(A)'s mandate that a 'defendant may be convicted of only one' allied offense is a proscription against sentencing a defendant for more than one allied offense. Nothing in the plain language of the statute or in its legislative history suggests that the General Assembly intended to interfere with a determination by a jury or judge that a defendant is guilty of allied offenses. As the state asserts, by enacting R.C. 2941.25(A), the General Assembly condemned multiple sentences for allied offenses, not the determinations that the defendant was guilty of allied offenses.

{¶ 115} "Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses

remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination." (Footnote omitted.) *Whitfield* at ¶26-27.

{¶ 116} The sixth assignment of error is sustained.

VIII

{¶ 117} Lewis's seventh assignment of error states:

{¶ 118} "THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."

{¶ 119} In his seventh assignment of error, Lewis claims that his counsel rendered ineffective assistance by failing to raise a *Batson* challenge, by failing to pursue cross-examination of Thomason regarding her burglary conviction under Evid.R. 608, and by failing to object to prosecutorial misconduct.

{¶ 120} To reverse a conviction based on ineffective assistance of counsel, an appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. Deficient performance means that claimed errors were so serious that the defense attorney was not functioning as the "counsel" that the Sixth Amendment guarantees. *State v. Cook* (1992), 65 Ohio St.3d 516, 524.

{¶ 121} Defense counsel arguably should have objected to certain statements by the prosecutor during opening and closing arguments and to the prosecutor's question to Thomason about how it felt to hold Gibson as he died. However, as discussed above, we do not find that the outcome of Lewis's trial would have been different if defense counsel had interjected objections. Accordingly, Lewis has not demonstrated that his counsel rendered ineffective assistance when he failed to object to the prosecutor's conduct.

{¶ 122} As for his counsel's failure to raise a *Batson* challenge, Lewis argues that his counsel misunderstood *Batson* and that counsel was ineffective by failing to challenge the State's peremptory exclusion of Juror Number 11, who was excused for no discernible reason.

{¶ 123} Counsel had two brief conversations with the juror during voir dire. The following exchange occurred during the State's questioning:

{¶ 124} "MR. FRANCESCHELLI: And then [Juror Number 11], how long have you been employed with your present employer, approximately?

{¶ 125} "PROSPECTIVE JUROR [11]: Three years.

{¶ 126} "MR. FRANCESCHELLI: Excellent. All right. Do you work solely at the location of the business, or do you go to people's home and all, or both?

{¶ 127} "PROSPECTIVE JUROR [11]: I work at the business.

{¶ 128} "MR. FRANCESCHELLI: At the business. Very good. now – and then – oh, never mind. All right. Thanks."

{¶ 129} Defense counsel's questioning of Juror Number 11 consisted of the following:

{¶ 130} "MR. CALAWAY: What does presumption of innocence mean?  Let's try [Juror Number 11].  You cold?

{¶ 131} "PROSPECTIVE JUROR [11]: Yes.

{¶ 132} "MR. CALAWAY: I – see, I'm clever; I picked up on that.  Well, they crank the temperature down because when you get lots of people in it, it seems to warm up; but give it a little time.  We might be able to work with you.  Okay.  I literally never had that happen in a trial, I got to say.

{¶ 133} "What does the presumption of innocence mean to you?

{¶ 134} "PROSPECTIVE JUROR [11]: The presentation of innocence?

{¶ 135} "MR. CALAWAY: The presumption of innocence.

{¶ 136} "PROSPECTIVE JUROR [11]: Presumption of innocence.  I'm trying to think how to word it.

{¶ 137} "MR. CALAWAY: Let me ask you a different question, make it a littler easier on you.  Theron sits here today.  He's been arrested.  He's been charged.  Does the fact that he's sitting there have any influence on you?

{¶ 138} "PROSPECTIVE JUROR [11]: No, because – I mean, he – it may have been someone else.  He may have been there at the wrong time.

{¶ 139} "MR. CALAWAY: Okay, so you're willing to just let everything aside and say, look, I'll wait and I'll see what's going to be said?

{¶ 140} "PROSPECTIVE JUROR [11]: Yes.

{¶ 141} "MR. CALAWAY: Okay. ***"

{¶ 142} The State used its first peremptory challenge against this juror.  As

demonstrated in our discussion of Lewis's fourth assignment of error, it is apparent that defense counsel mistakenly believed that he could not raise a *Batson* challenged until all minority jurors had been struck by the State.

**{¶ 143}** However, even if defense counsel's conduct constituted deficient performance, we have no means to evaluate whether counsel's failure to object prejudiced Lewis. In the absence of an objection, the State was not required to articulate its reasons for exercising a peremptory challenge against this particular juror, and the State did not volunteer its reasons. Consequently, from this record, we cannot determine whether the State had race-neutral explanations for the peremptory challenge and, if so, whether the trial court could have properly accepted such explanations as credible and not a pretext for racial discrimination. "We do not presume prejudice from a trial counsel's failure to raise a *Batson* challenge, and, as here, without an adequate record, we cannot properly consider on direct appeal a claim of ineffective assistance of counsel for a trial counsel's failure to raise a *Batson* objection." *State v. Burks*, Franklin App. No. 07AP-553, 2008-Ohio-2463, ¶57.

**{¶ 144}** Lewis cites *State v. Robertson* (1993), 90 Ohio App.3d 715, for the proposition that failing to raise a *Batson* challenge constitutes reversible error. In *Robertson*, defense counsel objected to the prosecutor's use of peremptory challenges after the jury had been sworn and seated. On appeal, the defendant argued, in part, that his counsel was ineffective in failing to assert a *Batson* challenge in a timely manner. While noting that "it would be an unusual case in which ineffective assistance of trial counsel would be clearly established in the record of a direct appeal, since a performance of trial counsel that appears from the record to have been deficient may have a reasonable

explanation in view of facts and circumstances that are not apparent from the record," id. at 720, we found no possible tactical reason existed for counsel to have waited to raise a *Batson* challenge. We further noted that "[t]here was at least a prima facie basis for a *Batson* challenge, since the defendant was an African-American and the state had used its peremptory challenges to excuse three African-American members of the panel, leaving only one African-American as an alternate juror who would probably not participate in deliberations." Id.

{¶ 145} Turning to whether a timely *Batson* challenge would have succeeded, we quoted the discussion between counsel and the court, during which the State offered reasons for having exercised peremptory challenges against three African-American prospective jurors; the trial court failed to make to determination as to whether it believed the State's explanations. With respect to one juror, we found that the record established that the State's explanation was credible. However, as to another juror, we found a remand to be necessary for the trial court to decide whether to accept the State's explanation, if it could recall the incident. In so doing, we stated: "It was the responsibility of the trial judge to determine whether this was the real reason for the state's having peremptorily challenged [the juror], and it is clear from the record that the trial judge was under the erroneous impression that that was no concern of his." Id. at 725.

{¶ 146} We find *Robertson* to be distinguishable. Upon the trial court's asking defense counsel if he wished to make a *Batson* challenge, defense counsel declined, and neither the trial court nor the State pursued the matter further. As discussed above, the trial court did not err in failing to conduct a *Batson* inquiry. Moreover, unlike *Robertson*, in

which the record demonstrated that the State had excused three African-American prospective jurors, leaving only one African-American juror as an alternate, the record here is silent as to the racial make-up of the jury pool, the race of the excused jurors, and the racial composition of the seated jury. We are faced with an undeveloped record, and we have no basis to conclude that Lewis was prejudiced by his counsel's failure to raise a *Batson* challenge.

{¶ 147} The seventh assignment of error is overruled.

IX

{¶ 148} The trial court's judgment will be affirmed in part, reversed in part, and remanded for resentencing consistent with this opinion.

. . . . . . . . . .

FAIN, J., concurs.

DONOVAN, J., dissenting:

{¶ 149} I disagree. Use of App.R. 9(C) and (E) are not reasonable or realistic alternatives in this case. Although an adequate transcript does not mean a perfect transcript, "inaudibles" and "indecipherables" permeate this trial during voir dire, critical eye witness testimony, sidebars and a jury instruction conference.

{¶ 150} App.R. 9(C) and (E) should not become a substitute for proper recording of trials. In this case, virtually every sidebar conference, and there are at least fifteen, are either completely inaudible or partially indecipherable. Notably, critical evidentiary rulings are frequently made at sidebar and in this case, impactful sidebar rulings were made. These were not simply ministerial sidebars. Crim.R. 22 states in part: "in serious offense cases all

proceedings shall be recorded in shorthand, or stenotype, or by any other adequate mechanical, electronic or video recording device." Although the appellant has a duty to provide a transcript that is adequate for an appellate court to review and defense counsel plays a key role in making the record, the responsibility for its creation in the first instance rests with the trial court. The trial court has the ultimate responsibility to bring about an adequate record for review including sidebars. "The minimal effort needed to comply with Crim.R. 22 is far outweighed by the expense, in time and taxpayer money, of retrying a complex criminal case." *State v. Brewer* (1990), 48 Ohio St.3d 50, 61.

{¶ 151} Although the State asserts, and the majority agrees, that Lewis did not take the appropriate steps to rectify the gaps in the transcript and that he has made no showing of prejudice, App.R. 9(C) and (E) must be tempered with reason such that this duty is not transformed into an impossible burden. The problem is magnified when, as here, the attorney representing the appellant is different from the attorney who represented him at trial. An incomplete record such as this (it must be emphasized that Appellant is serving a life sentence) compromises appellate counsel's ability to advocate on behalf of his client and renders illusory the right to notice plain errors or defects.

{¶ 152} This trial began under a cloud of ineffective assistance as evidenced by, yes, a partially indecipherable sidebar. It is rather alarming that appointed counsel, defending a homicide indictment so misunderstood *Batson* that he believed such an objection could be lodged only when the last African American juror was excused. The illusory nature of noticing error when the record is flawed is also apparent at page(s) 137-138 of the transcript during voir dire when a sidebar is completely lost during questions raised by defense counsel

regarding gang affiliation. In fact, testimony was adduced regarding gang affiliation in this trial. Voir dire questions on the subject would have been permissible and critical to revealing juror prejudice. However, such questions were interrupted by the court with a comment "we've got to move on." (Tr., p. 137, line 18). Thereafter, defense counsel abruptly terminated his limited voir dire completely. This sidebar is completely inaudible, (Tr., p. 138, line 5) making this issue unseen and incapable of assessment.

{¶ 153} Although the majority suggests these problems are certainly not unique to audio and/or video recording systems, citing the *Jones* and *Knapp* cases, I disagree with such a conclusion. In the *Jones* case, there is no suggestion a proper record was not created in the first instance, rather *Jones* involved a delayed appeal (over ten years) and the court reporter's notes had been properly destroyed. In *Knapp*, the original record (stenographer notes) existed, but the reporter was too ill to transcribe them.

{¶ 154} On the other hand, the problems portrayed by this record are unique to some of these audio/visual courtrooms and have arisen in prior cases, although to a lesser extent, including *State v. Walton*, Montgomery App. No. 20615, 2006-Ohio-1974; *State v. Arment*, Montgomery App. No. 19459, 2003-Ohio-4089; *State v. Thompson*, 161 Ohio App.3d 334, 2005-Ohio-2508; *State v. Bowman*, Montgomery App. No. 22459, 2008-Ohio-5157; and *State v. Owings*, Montgomery App. No. 21429, 2006-Ohio-4281. This is not a comprehensive list as this court has previously resorted to viewing the videotape in many instances in an attempt to discern what, in fact, occurred. Such an attempt is of no value in this case, as resort to the videotape reveals obvious gaps, inaudibles and indecipherables.

{¶ 155} The cumulative error portrayed by this record, along with evidence of

ineffective assistance of trial counsel and an unlawful lack of complete record, create a lack

of confidence in the verdict.   I would reverse and order a new trial.

. . . . . . . . . .

Copies mailed to:

R. Lynn Nothstine
Laura M. Woodruff
Darrell L. Heckman
Hon. Frances E. McGee