[Cite as *State v. Rucker*, 2012-Ohio-4860.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                     :

    Plaintiff-Appellee                  :            C.A. CASE NO.   24340

v.                                                :            T.C. NO.   10CR1986

SIDNEY RUCKER, II                                 :            (Criminal appeal from
                                                               Common Pleas Court)

    Defendant-Appellant                 :

                                                  :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    19th    day of    October   , 2012.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. No. 0084707, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Sidney Rucker was convicted, after a jury trial, of aggravated robbery and kidnapping, each with a firearm specification. The trial court sentenced Rucker to four years for the aggravated robbery and three years for the kidnapping, to be served concurrently. The court merged the firearm specifications and imposed an additional three years of incarceration for the specification,

for an aggregate sentence of seven years in prison. Rucker appeals from his convictions.

{¶ 2} Rucker's original appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that after thoroughly examining the record and the law, he found no potentially meritorious issues for appeal. Upon an initial review, we found that potentially meritorious issues existed, and we appointed new counsel.

{¶ 3} Rucker now raises six assignment of errors on appeal. For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 4} Although Rucker has not raised an argument based on the sufficiency or weight of the evidence, a summary of the evidence at trial will assist in our review of several of his assignments of error.

{¶ 5} According to the State's evidence, in the early afternoon on June 23, 2010, James Leigh returned to the Dayton area after completing a commercial trucking job. After spending some time at Stanley Truck Sales, where he stores his truck, Leigh went to his parents' home, where he lived with his maternal grandmother, parents, teenaged niece, and young daughter. Sometime after 5:00 p.m., Leigh arranged to meet a female acquaintance at Citizen Mart, the nearby "corner store."

{¶ 6} Leigh drove his mother's car to Citizen Mart, bought some cigarettes, and then waited in the car for his friend. While Leigh waited, an unfamiliar young man wearing a red polo shirt and blue jean shorts knocked on the driver's side door. Leigh lowered the window, and the man told him that his car had run out of gas; the man asked for a ride to the gas station. Leigh responded that he was "not going that way" and that he was "doing something." The man said "okay" and stepped away. Immediately afterward, Leigh drove to another friend's home and, when she was not there, he returned to Citizen Mart.

{¶ 7} While Leigh sat in his car in the parking lot, the same young man (later identified

as Rucker) got into the passenger side of the car, pulled out a gun, and repeatedly told Leigh to "drive" and "take me to the money." Leigh threw his wallet at Rucker, and Rucker retrieved $18 – two $5 and eight $1 bills. Rucker still threatened to shoot Leigh and told Leigh to take him to an ATM and to Leigh's truck. Leigh did not have an ATM card; he drove toward his home. While en route, Leigh tried unsuccessfully to grab the gun. Rucker swung the gun, hit Leigh on the side of his face, and threatened to shoot Leigh if he "tried that again."

{¶ 8} When Leigh got to his parents' home, Leigh told Rucker that he was going to "run in here and see if I can get some money from my parents." Leigh and Rucker went inside, and Leigh asked his mother, "Mama, you got some money that my friend can borrow?" Leigh's mother said she did not have any money. Leigh told Rucker that he would get some from his father, and they left the house.

{¶ 9} Leigh's mother, Patricia Leigh, testified that her son was acting nervous and she "knew something was wrong." As Leigh and Rucker left the house, she looked out the front window and saw Rucker holding a gun down by his leg. Mrs. Leigh told her granddaughter (Leigh's niece) to call the police.

{¶ 10} Outside, a neighbor across the street asked Leigh if he could have a cigarette. After Leigh responded to the neighbor, Mrs. Leigh came out of her house and asked how much money was needed. Rucker responded that he needed a "stack," meaning $1,000. Mrs. Leigh heard Rucker ask Leigh, "Do you want me to get your mama?" Leigh waved to his mother to get inside and yelled, "Shut the door." Mrs. Leigh went back into the house, and Leigh "took off running" through yards in the neighborhood. Rucker pursued him. Mrs. Leigh called the police on her cell phone and, as she talked, got into her car to try to locate her son.

{¶ 11} A few blocks away, Leigh noticed a vehicle with its trunk open in the driveway of one home. Believing that someone might be home, Leigh ran to the front screen door of that house

and tried to get inside, but the door was locked. He continued running, knocking off the homeowner's mailbox "so they could hear some kind of ruckus outside." Leigh attempted to jump the chainlink fence to the next yard, but his pant leg got caught and he fell over the fence and onto the ground.

{¶ 12} Reginald Lewis, the owner of the home that Leigh had tried to enter, came out of his house. He saw a man (Leigh) on his knees in Lewis's neighbor's yard while another man (Rucker) pointed a 9mm or .45 caliber handgun at Leigh. Lewis did not know either individual. Lewis heard Leigh begging Rucker, "Please don't do this," and saw Rucker hit Leigh in the face with the gun. Rucker then "trotted" down the street. Lewis saw Rucker put the gun in his pants as he went up the street. Leigh saw Lewis and asked to borrow Lewis's cell phone. As he attempted to call his parents, Leigh saw his mother driving her car up the street. Leigh got into the car, and Mrs. Leigh drove them home.

{¶ 13} Deputy Penelope Vo received a report that "a light-skinned black male [was] being chased by a dark-skinned black male." The dispatcher relayed that the suspect was wearing a red polo shirt and blue jeans shorts and was carrying a black handgun; the victim was also reportedly wearing a red shirt and blue pants. Vo was dispatched to an intersection in Leigh's neighborhood.

{¶ 14} While en route, Deputy Vo saw a shirtless black man in blue jean shorts and carrying something red running in an overgrown field a few blocks from Lewis's house. She broadcasted to other officers, "I see this gentleman running." Vo drew her firearm, intercepted Rucker in the field, and ordered him to the ground. Rucker complied. Deputy Joseph Caito drove up into the field, handcuffed Rucker, patted him down, and placed him in a cruiser. Caito collected Rucker's personal property, including two bundles of money (one of which was a stack with $18) and a cell phone, and placed the items on the cruiser's front passenger seat. No handgun was found. After Caito and Vo briefly searched the field for the handgun, Caito drove Rucker to the Leighs'

home, where Leigh identified Rucker as the perpetrator. At trial, Leigh, Mrs. Leigh, and Lewis identified Rucker as the perpetrator, and all stated that Rucker had a gun.

{¶ 15}    Rucker testified on his own behalf and presented three witnesses. Rucker testified that he was a student at Miami Jacobs College, and that he met Leigh at Citizen Mart a couple of weeks before June 23, 2010. Rucker testified that he had sold Leigh a little less than one-half ounce of marijuana, worth $50, on credit. At that time, Rucker had gotten Leigh's cell phone number and learned that Leigh was a trucker.

{¶ 16}    Rucker testified that on June 23, 2010, he picked up his friend, Jere Chappel, at Chappel's place of employment, and the two men drove around together. They eventually went to Citizen Mart. While there, Rucker saw Leigh sitting in a car. Rucker approached Leigh and asked him for his money. Rucker testified that Leigh gave him the $18 that he had and invited Rucker to come with him to his parents' home. Rucker described Leigh's asking his mother for money and stated that a neighbor asked Leigh for a cigarette. Rucker testified that Mrs. Leigh came onto her front porch and spoke with Leigh. When Rucker turned his attention back to Leigh, Leigh was running away from him. Rucker acknowledged that he followed Leigh briefly, but denied going onto the street where Lewis lived. Rucker denied that he had a gun or had ever pointed a gun at Leigh.

{¶ 17}    Chappel testified that he drove around with Rucker in Rucker's truck beginning at 2:00 p.m. on June 23, 2010, and they eventually went to Citizen Mart. Chappel stated that he stayed in Rucker's truck while Rucker went into the store. When Rucker got out of the store, he went over to Chappel and told him that he would be "right back." Chappel saw Rucker leave in a car. Chappel continued to wait in Rucker's truck. Approximately ten to fifteen minutes later, Rucker called Chappel and told Chappel that he (Rucker) was going to jail and that Chappel should take his truck home.

{¶ 18}    Joe Anderson, the Leighs' neighbor, testified that he saw Leigh and another man on

June 23, 2010, and that he got a cigarette from Leigh. Anderson did not see what happened after he obtained the cigarette. Rucker's sister testified that Rucker has a reputation as an honest, non-violent person. On cross-examination, she stated that she was not aware of Rucker's arrest for burglary in 2007.

{¶ 19}   The State called Dayton Police Officer Aaron Fraley as a rebuttal witness. Fraley testified that Rucker had told him that he (Rucker) had met Leigh previously and that Rucker had approached Leigh to ask if he (Leigh) knew where to get marijuana. Fraley further testified that Rucker admitted to "chasing" Leigh through the neighborhood, but that Rucker stated that he was carrying his cell phone rather than a handgun.

{¶ 20}   Rucker was indicted with aggravated robbery and kidnapping, each with a firearm specification. A jury convicted him of both counts, and he was sentenced to an aggregate term of seven years in prison.

II.

{¶ 21}   Rucker's first assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS.

{¶ 22}   In his first assignment of error, Rucker claims that the trial court erred in denying his motion to suppress the "live identification" of him by the one of the alleged victims. He claims that the police officers lacked a reasonable suspicion of criminal activity at the time he was stopped and that the officers lacked probable cause to arrest him. He now claims that the pre-trial identification resulted from the unlawful seizure and should have been suppressed.

{¶ 23}   Shortly before trial, Rucker moved to suppress the pre-trial identification on the ground that the identification procedures were unduly suggestive and conducive to irreparable mistaken identification. The court held a hearing on the motion, at which Deputies Vo and Caito

testified. At the conclusion of the hearing, the trial court overruled Rucker's motion, finding that "there is no evidence of any undue suggestibility associated with the show-up, other than the circumstances inherent in a show-up circumstance in and of itself of having the Defendant present in the back of * * * a cruiser."

**{¶ 24}** As noted by the State in its brief, Rucker did not argue in the trial court that the identification should be suppressed on the ground that his stop and detention were unlawful. Accordingly, Rucker has waived this argument on appeal. However, we will discuss this issue in more detail under Rucker's fifth and six assignments of error, where he argues ineffective assistance of counsel.

**{¶ 25}** Rucker's first assignment of error is overruled.

III.

**{¶ 26}** Rucker's second assignment of error states:

THE PROSECUTOR COMMITTED REVERSIBLE MISCONDUCT.

**{¶ 27}** In his second assignment of error, Rucker claims that the prosecutor engaged in misconduct when he (1) asked the victim and the victim's mother about how their lives were affected by the alleged robbery and kidnapping and (2) told the jury during closing argument, "We do not reward defendants for getting rid of the gun. We don't do it."

**{¶ 28}** In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.,* quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed.

*See State v. Underwood,* 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson,* 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 29}** Rucker did not object to the prosecutor's statement during closing argument or to the questions posed to Leigh and his mother concerning how the offenses affected them. Consequently, we review them for plain error. Plain error may be noticed if a manifest injustice is demonstrated. Crim.R. 52(B); *State v. Lewis*, 2d Dist. Montgomery No. 23850, 2011-Ohio-1411, ¶ 54. In order to find a manifest miscarriage of justice, it must appear from the record as a whole that but for the error, the outcome of the trial clearly would have been otherwise. *Id*., citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

**{¶ 30}** Rucker argues that the prosecutor's statement, "We do not reward defendants for getting rid of the gun. We don't do it," was an improper statement of the prosecutor's personal belief or opinion. We have previously addressed a similar comment by the prosecutor regarding the absence of a firearm, stating:

> [T]he State correctly asserts – and the prosecutor correctly stated during voir dire – that the prosecution was not required to produce the weapon in order to prove the firearm specifications. Circumstantial evidence and direct evidence have equivalent probative value. Consequently, the State could prove the firearm specification solely on the basis of circumstantial evidence; the prosecutor could have reasonably informed the prospective jurors of that fact.

> However, the prosecutor's proffered reason for not requiring the weapon to be produced, i.e., that "we don't reward people for shooting someone and getting rid of a firearm," was objectionable. Lewis was not charged with tampering with evidence, and no evidence was submitted at trial to support the contention that Lewis

"got rid of" or "concealed or destroyed" the firearm. The mere fact that the gun was not recovered at the scene is insufficient to establish tampering with evidence. Nevertheless, in this case, the felonious assault and murder offenses arose out of the shooting death of [the victim]; there was overwhelming evidence that an operable firearm was used in the commission of the offenses. Accordingly, we find the prosecutor's statements to be harmless beyond a reasonable doubt.

(Citations omitted.) *Lewis* at ¶ 45-46.

**{¶ 31}** Here, the prosecutor stated during his closing argument, "Remember, just because the gun is not here today doesn't mean you cannot say the words guilty for a gun crime. We do not reward defendants for getting rid of the gun. We don't do it." This statement might be better characterized as an improper comment on the evidence rather than an improper statement of the prosecutor's personal opinion or belief. Regardless of the characterization, for the reasons we expressed in *Lewis*, the prosecutor's statement was objectionable.

**{¶ 32}** Nevertheless, we find that the prosecutor's statement was harmless beyond a reasonable doubt. Before the offending statement, the prosecutor detailed the evidence that had been presented about Rucker's possession of a gun. Three witnesses – Leigh, Leigh's mother, and Lewis – all testified that they saw Rucker with a gun, and both Leigh and Lewis described the gun for the jury. Most notably, Lewis, who had no prior relationship with any of the parties, testified that he saw Rucker pointing a 9mm or .45 caliber gun at Leigh and hit Leigh in the face with the gun. Upon reviewing the trial as a whole, we conclude that the prosecutor's statement was harmless beyond a reasonable doubt.

**{¶ 33}** Rucker further argues that the prosecutor's questions to Leigh and Leigh's mother regarding how they have been affected by Rucker's actions amount to prosecutorial misconduct. In response to the prosecutor's questions, Leigh testified that he lost his "dedicated run" with the

trucking company due to the many court appearances concerning this case. Leigh's mother testified that she now keeps the doors of her home locked, which she did not previously do, and she has a baseball bat by the door. She also testified that she no longer feels safe inside her home.

{¶ 34} Victim-impact evidence is admissible in certain circumstances, such as when the evidence relates to both the facts attendant to the offense and the effect on the victim. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 138, citing *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995). In this case, however, the prosecutor's questions regarding the effects that the crimes had on Leigh and his mother were not relevant to Rucker's guilt or innocence, and the only apparent purpose for those questions was to elicit sympathy for the victims. Nevertheless, the prosecutor did not dwell on the impact of the crimes on the victims, either during questioning or in closing argument. Given the overall context of the trial, we find no basis to conclude that these limited questions affected the outcome of the trial

{¶ 35} Rucker's second assignment of error is overruled.

IV.

{¶ 36} Rucker's third assignment of error states:

THE TRIAL COURT IMPROPERLY ANSWERED A JURY QUESTION DURING DELIBERATIONS WITHOUT COUNSEL PRESENT.

{¶ 37} In his third assignment of error, Rucker claims that the trial court erred when it answered a question by the jury during its deliberations outside of his presence and without affording his attorney an opportunity to object or offer input on how the question should be answered.

{¶ 38} The trial transcript reflects that around 11:20 a.m. on the second day of deliberations, the jury sent the court, through the bailiff, a written question, which asked, "Does kidnapping have an end point? Is it the mothers [sic] house[?] Can the kidnapping charge include the cycle of Citizen's Mart [to] James' house [to] Mr. Lewis's house[?] In other words, can we

consider that James was not 'released' of his constraint until he left Lewis's house[?]" The court attempted to contact counsel, but was only able to reach the prosecutor. At 11:45 a.m., without consulting with either of the attorneys regarding the jury's question, the court answered the question, in writing, as follows: "Focus on action, if you find it occurred. Look at page 7, <u>Count II</u> of the instructions[.]" (Emphasis in original.) Count II was the court's written instruction on kidnapping, which was located on page 7.

{¶ 39} At approximately 11:50 a.m., defense counsel came to the court. The prosecutor was contacted, and the court retrieved the jury's question and the written answer from the jury. The question was then discussed with the attorneys, who had different views on how the question should have been answered. (Rucker's presence was waived by his counsel for purposes of this discussion.) The prosecutor indicated that he did not believe that the court's response answered the jury's question, but he did not believe the answer itself was wrong. The prosecutor stated that the proper answer to the jury's question as to whether it could "consider that James was not 'released' of his constraint until he left Lewis's house" was "yes." The prosecutor further suggested that the court add "regardless of duration" to its answer.

{¶ 40} Defense counsel also objected to the court's answer, stating that the court should have simply referred the jury to its collective memory for the factual issue and provided a reference to the legal instructions on the definition of kidnapping. Defense counsel further objected to the court's answering the jury's question without consulting with counsel, and he requested a mistrial due to both the court's answer and the procedure it followed. The court denied the motion for a mistrial, and it ruled that it would not change the answer that it had previously given to the jury. The answer was returned to the jury without modification.

{¶ 41} As an initial matter, a criminal defendant has a right pursuant to the Fourteenth Amendment to be present at every "critical stage" of his trial. *State v. Campbell*, 90 Ohio St.3d 320,

346, 738 N.E.2d 1178 (2000), citing *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). *See also* Crim.R. 43. "The question is whether 'his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Campbell* at 346, quoting *Snyder* at 105-106.

**{¶ 42}** "As a general rule, any communication between judge and jury that takes place outside the presence of the defendant or parties to a case is error which may warrant the ordering of a new trial. Such communications are required to be made in the presence of the defendant or parties so that they may have an opportunity to be heard or to object before the judge's reply is made to the jury." (Citations omitted.) *Bostic v. Connor*, 37 Ohio St.3d 144, 149, 524 N.E.2d 881 (1988).

**{¶ 43}** Nevertheless, when defense counsel is present, a defendant's constitutional rights are not violated when he is absent during the conference regarding the court's response to the jury's question. *State v. Everette*, 2d Dist. Montgomery No. 22838, 2009-Ohio-5738, ¶ 15, citing, *e.g.*, *Campbell* at 346. And "[a]lthough the oral delivery of jury instructions is a critical stage of a trial, a trial court's written response to a jury question seeking to clarify those instructions is not." *State v. Martin*, 2d Dist. Montgomery No. 22744, 2009-Ohio-5303, ¶ 10, citing *Campbell* at 346.

**{¶ 44}** In this case, the trial court erred by engaging in a communication with the jury, without first providing counsel an opportunity to be heard or to object. "Such private communication outside the presence of the defendant does not, however, create a conclusive presumption of prejudice. The communication must have been of a substantive nature and in some way prejudicial to the party complaining." (Citations omitted.) *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). For example, when the trial court's response merely reiterates the same instruction that the jury originally received, the improper ex parte communication is harmless. *State v. Abrams* , 39 Ohio St.2d 53, 56, 313 N.E.2d 823 (1974).

**{¶ 45}** As stated above, the trial court's communication with the jury concerned a question

from the jury regarding the duration of the kidnapping. The trial court responded, in writing, telling the jury to "focus on action, if you find it occurred" and to review the jury instruction on kidnapping, which was located on page 7 of the written instructions. The court did not expressly tell the jury, as requested by defense counsel, to rely on its collective memory as to what had occurred and to apply its findings to the instructions previously provided by the court, but the trial court's written response was, in essence, such an instruction. The court did not answer the jury's question as to whether kidnapping had an endpoint, and it did not provide any supplemental instruction on the relevant law or how to apply the facts to the law previously provided. Moreover, the answer given to the question was the same both before and after hearing from the attorneys. Because the trial court's response essentially reiterated the instructions previously provided, albeit not in the same words, we conclude that the court's erroneous communication with the jury during deliberations was harmless.

{¶ 46} The third assignment of error is overruled.

V.

{¶ 47} Rucker's fourth assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO MERGE APPELLANT'S CONVICTIONS AS ALLIED OFFENSES OF SIMILAR IMPORT.

{¶ 48} Rucker's fourth assignment of error asserts that the trial court erred in failing to merge his aggravated robbery and kidnapping convictions as allied offenses of similar import. At sentencing, the trial court told Rucker that it had "considered whether or not these were allied offenses [of] similar import, and did the review and the analysis under *State v. Williams*. The Court believes these are not allied offenses of similar import."

{¶ 49} R.C. 2941.25 addresses the issue of merger and provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain

counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 50}** The Ohio Supreme Court's test for determining when offenses are allied offenses of similar import that must be merged pursuant to R.C. 2941.25 was set forth in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The supreme court held that, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.* at syllabus. It explained:

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of

similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Citations and quotations omitted.) *Johnson* at ¶ 47-51.

**{¶ 51}** A defendant who argues on appeal that the trial court erred by not merging multiple offenses bears the burden to show that the offenses are allied pursuant to R.C. 2941.25. *State v. Hale*, 2d Dist. Clark No. 11 CA 33, 2012-Ohio-2662, ¶ 24.

**{¶ 52}** The Ohio Supreme Court has recognized that the commission of aggravated robbery necessarily involves the restraint of the victim. *See State v. Jenkins*, 15 Ohio St.3d 164, 198, 473 N.E.2d 264 (1984), fn. 29 (kidnapping is implicit within every aggravated robbery). However, aggravated robbery and kidnapping are not always allied offenses of similar import. A separate animus for kidnapping exists where (1) "the restraint is prolonged, the confinement is secretive, or the movement is so substantial as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), syllabus.

**{¶ 53}** Here, Leigh's restraint was prolonged, created a substantial risk of harm, and involved substantial movement from the Citizen Mart store, where Leigh initially encountered Rucker. Rucker ordered Leigh, at gunpoint, to "drive" and take him to the money. Leigh's restraint continued after Leigh gave Rucker his wallet; Rucker told him to go to an ATM and to his truck, and he threatened and hit Leigh with his weapon when Leigh tried to grab the gun. Rucker continued to restrain Leigh with his gun while Leigh drove to his parents' home and Leigh attempted to obtain

money from his mother. After Leigh ran away from Rucker, Rucker again restrained Leigh's movements at Lewis's home, where Rucker threatened and assaulted Leigh with his weapon.

**{¶ 54}** Given the facts of the case, the trial court found that Rucker acted with a separate animus when he engaged in the kidnapping. We find no fault with the trial court's conclusion.

**{¶ 55}** The fourth assignment of error is overruled.

VI.

**{¶ 56}** Rucker's fifth and sixth assignments will be addressed together. They read:

APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S ASKING OF IRRELEVANT QUESTIONS WHICH WERE PREJUDICIAL TO APPELLANT.

APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE ALL OTHER MERITORIOUS ISSUES PRESENTED ABOVE.

**{¶ 57}** In his fifth and sixth assignments of error, Rucker claims that his trial counsel acted deficiently by failing to object to the prosecutor's victim-impact questions, the prosecutor's closing argument, and to the court's failure to merge his offenses as allied offenses of similar import. He also claims that his trial counsel should have moved to suppress his clothing and the live identification of him.

**{¶ 58}** We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that counsel's errors were

serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

**{¶ 59}** The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Rather, trial counsel's failure to file a motion to suppress constitutes ineffective assistance of counsel only if the failure to file the motion caused the defendant prejudice; that is, when there is a reasonable probability that, had the motion to suppress been filed, it would have been granted. *State v. Howard*, 2d Dist. Montgomery No. 23795, 2011-Ohio-27, ¶ 22, citing *State v. Wilson*, 2d Dist. Clark No. 08 CA 445, 2009-Ohio-2744, ¶ 11.

**{¶ 60}** As previously discussed, the prosecutor's victim-impact questions and the prosecutor's closing argument, although improper, did not affect the outcome of Rucker's trial. Consequently, we cannot conclude that Rucker was prejudiced by his counsel's failure to object to the prosecutor's conduct. In addition, we have concluded that the trial court did not err in failing to merge Rucker's offenses as allied offenses of similar import. Accordingly, Rucker's counsel did not act deficiently by failing to object to the court's imposition of sentence on both of Rucker's offenses.

**{¶ 61}** With respect to the motion to suppress, Rucker argues that his counsel should have argued in a motion to suppress that he was seized unlawfully and therefore the show-up identification by Leigh, which occurred during that seizure, should have been suppressed.

**{¶ 62}** The testimony of Deputies Vo and Caito at the suppression hearing revealed the following facts:

**{¶ 63}** At approximately 6:08 p.m. on June 23, 2010, Deputies Vo and Caito both heard a dispatch that a "dark-skin, black male," who was wearing a red polo shirt and blue jean shorts and carrying a black handgun, was chasing a "light-skin black, male" in a red shirt and blue jeans. Vo indicated that the dispatcher had received several calls, including a call from the victim's niece and an identified witness on a nearby street. Vo understood that the incident was "in progress," and the deputies were provided an intersection where they were to go to locate the perpetrator. Both deputies headed toward that location in separate marked cruisers.

**{¶ 64}** As Deputy Vo approached the area, she saw a "dark-skinned, black male [with] no shirt on", who was wearing blue shorts and carrying a "red object," running into an overgrown vacant lot. Vo parked her cruiser, approached the man (Rucker), and ordered him at gunpoint to get on the ground. Vo saw that the man was carrying a red polo shirt; she did not see a handgun or another person being chased. As the man was getting onto the ground, Deputy Caito drove up in his cruiser, handcuffed the man, and put him in his cruiser.

**{¶ 65}** Deputies Vo and Caito briefly looked around the lot for the missing handgun. Vo then "backtracked the steps" that she had seen Rucker running, while Caito took Rucker to the victim's home. Caito parked near the victim's home and approached Sergeant Statzer, who was standing just inside the victim's front door. Caito asked Statzer to step outside with him. Caito then informed Statzer that "the subject that Deputy Vo had located was in the back of my car, and [he] asked [Statzer] if he wanted to do a live ID on that subject." Within a few seconds, Statzer "got the victim from the house," and told him, "We have a subject in the back of the car we'd like you to take a look at, see if you recognize them." Statzer and the victim came within two feet of Caito's cruiser, the victim looked in the back window, and the victim stated without hesitation, "That's him. That's the guy." (At that time, Rucker's red shirt was on the seat next to him.) The victim then went back into his house.

{¶ 66} Rucker does not now challenge the trial court's conclusion that the show-up identification by Leigh was not unduly suggestive. Rather, his argument turns on whether the deputies properly detained him and brought him to Leigh's residence for the identification.

{¶ 67} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin,* 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry.* We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard,* 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews,* 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop.

{¶ 68} In this case, we cannot conclude that Rucker's counsel acted deficiently by failing to challenge the show-up identification on the ground that Rucker's seizure by the police, prior to the identification, was unlawful. The deputies' testimony at the suppression hearing established that they were responding to several reports that a man in a red polo shirt and blue shorts and carrying a black handgun was currently chasing another man. The deputies responded immediately, and when Deputy Vo was within a few blocks of the intersection reported in the dispatch, she saw Rucker, who matched the physical description, running in a vacant field and heading away from the reported location. Rucker was wearing blue jeans and Deputy Vo could see that he was carrying something red in his hands. All of these facts (*e.g.*, the timing and location of the encounter and the suspect's description), when considered together, created a reasonable suspicion that Rucker was the person

who had chased another man with a gun, as reported in the dispatch. Deputies Vo and Caito were thus entitled to stop and detain Rucker to investigate that reported criminal activity.

{¶ 69} It is arguable that the deputies' conduct at the vacant field may have placed Rucker in custody in the absence of probable cause to arrest him. Nevertheless, the officers had sufficient information to create a reasonable suspicion that Rucker was the perpetrator of the crimes against Leigh, and they were therefore entitled to detain him to investigate that possibility. As part of that detention, the officers were permitted to transport Rucker to Leigh's residence for a show-up identification. Based on the record before us, we cannot conclude that Rucker would have prevailed on his motion to suppress based on an unlawful detention had Rucker's counsel presented such a motion in the trial court.

{¶ 70} Finally, Rucker argues that his attorney should have moved to suppress his clothing. The record contains no testimony as to when Rucker's clothing was seized, but we infer from the evidence at the suppression hearing that his clothing was taken after the show-up identification. At that juncture, there was probable cause to arrest Rucker, and we can find no basis in the record to conclude that counsel would have prevailed had he filed a motion to suppress the seizure of Rucker's clothing.

{¶ 71} Rucker's fifth and sixth assignments of error are overruled.

VII.

{¶ 72} The trial court's judgment will be affirmed.

. . . . . . . . . .


GRADY, P.J., concurs.

HALL, J., concurring:

{¶ 73} I agree with all the reasoning in the lead opinion except whether the prosecutor's

argument "We do not reward defendants for getting rid of the gun. We don't do it" is objectionable as an improper comment on the evidence or an improper statement of personal opinion. I don't believe it is either.

**{¶ 74}** The defendant was apprehended a few blocks from where he had committed the aggravated robbery with a firearm a few minutes earlier. He did not have a firearm in his possession upon arrest. It was reasonable for the jury to infer, and for the prosecutor to comment, that he had gotten rid of the gun.

**{¶ 75}** I also don't agree that the quoted comment is an improper statement of personal opinion. The Supreme Court of Ohio has held that a prosecutor may express his personal opinion in closing arguments if he bases that opinion on the evidence presented in court. *See State v. Keenan*, 66 Ohio St.3d 402, 408, 613 N.E.2d 203 (1993). What was found objectionable in *Keenan* was the prosecutor's personal comments about "his own emotions and the fervor with which he believed in Keenan's guilt." *Id*. Here, I don't interpret the quoted statement as personal opinion at all.

**{¶ 76}** I am concerned however that the quoted statement is objectionable to the extent that it uses the word "We." Imploring the jury not to reward the defendant for getting rid of the gun is a powerfully crafted argument. But using the word "we" in the sentences suggests that the jury should become part of the prosecution team and convict the defendant because of a sense of common righteousness.

**{¶ 77}** I agree, nevertheless, whether objectionable or not, the prosecutor's statement was harmless beyond a reasonable doubt. I therefore concur in affirming the judgment of the trial court.

. . . . . . . . . .


Copies mailed to:

R. Lynn Nothstine
Brock A. Schoenlein

Hon. Mary L. Wiseman