[Cite as *State v. Barksdale*, 2013-Ohio-2926.]

1

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25320 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2012-CR-389 |
| v. | : | |
| | : | |
| RONALD BARKSDALE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 3rd day of July, 2013.

· · · · · · · · · · ·

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. #0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

· · · · · · · · · · · ·

DONOFRIO, J.,

{¶1}    Defendant-appellant Ronald Barksdale appeals his conviction in the Montgomery County Common Pleas Court for felonious assault following a jury trial.

{¶2}   On January 20, 2012, Linda Quarterman was at her friend April Craver's house at 5642 Hoover Avenue in Dayton. Craver had invited people to her home that evening for "cocktails." Barksdale, with whom Quarterman had a romantic relationship in the past, was also there. Barksdale and Quarterman got into an argument in the front room of the house away from the other guests which resulted in Quarterman suffering a broken nose.

{¶3}   On March 14, 2012, a Montgomery County grand jury indicted Barksdale on one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. Barksdale pleaded not guilty, the trial court appointed him counsel, and the case proceeded to discovery and other pretrial matters. The case culminated in a two-day jury trial occurring on July 23-24, 2012.

{¶4}   A police officer, Officer Joseph Heyob, who responded to a 911 call from the house, testified about finding Quarterman lying curled up on the floor and bleeding from her face. (Tr. 83.) Although she did not witness the assault, Craver testified about the events of that evening in general. Nathan Via, a detective with the Special Victims Unit, testified about taking pictures of Quarterman after the incident. Quarterman testified that Barksdale punched her after she rebuffed his attempts to rekindle their relationship. Barksdale testified in his own defense, claiming that Quarterman was the one trying to re-establish their relationship and that he rejected her. He denied punching her and claimed that she was under the influence of drugs and alcohol.

{¶5}   The jury found Barksdale guilty and the trial court sentenced him to a four-year term of imprisonment. This appeal followed.

{¶6}   Barksdale raises four assignments of error, the first of which states:

THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE PHOTOGRAPHS OF THE VICTIM TO BE ADMITTED INTO EVIDENCE.

{¶7} Barksdale argues that the trial court erred in admitting into evidence six pictures depicting the injuries to Quarterman's face. Barksdale argues that the pictures were not properly authenticated. Since the parties stipulated that Quarterman suffered serious physical harm, Barksdale also argues that their admission was irrelevant and served only to play on the jurors' emotions and bolster Quarterman's credibility.

{¶8} "The admission of photographs is left to the sound discretion of the trial court. *State v. Biros* (1997), 78 Ohio St.3d 426, 444, 678 N.E.2d 891, citing *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710. The trial court, and this court on appeal, must determine whether the probative value of the photographs in question is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. The mere fact that a photograph is gruesome is not sufficient to render it per se inadmissible. *State v. Woodards* (1966), 6 Ohio St.2d 14, 25, 215 N.E.2d 568." *State v. Free*, 2d Dist. Montgomery No. 15901, 1998 WL 57373 (Feb. 13, 1998).

{¶9} As the state correctly points out, the photographs were properly authenticated. Quarterman testified that each of the photographs showed the injuries that resulted from Barksdale punching her in the face. (Tr. 149-155.) She testified that the first three photos taken a couple of days after the assault fairly and accurately reflected her injuries. (Tr. 152.) The last three photos, Exhibits 4 through 6, were taken by Nathan Via, a detective with the Special Victims Unit, eleven days after the incident. (Tr. 152.) She testified that those too fairly and accurately represented her injuries. (Tr. 155.)

{¶10} Barksdale's argument that the photographs were not relevant also falls short. Barksdale has not cited any case law authority in support of his argument. While it is true that the photographs were unnecessary to demonstrate that Quarterman had suffered serious physical

harm since that had been stipulated to, the photographs were relevant to another key element of the case – mens rea. Appellate courts have upheld a trial court's admission of a victim's injuries in order to establish mens rea. *State v. Rogers*, 1st Dist. Hamilton No. C-970190, 1998 WL 321300 (June 19, 1998); *see also State v. Free*, 2d Dist. Montgomery No. 15901, 1998 WL 57373 (Feb. 13, 1998) (involving felonious assault with a motor vehicle).

{¶11} Accordingly, Barkdale's first assignment of error is without merit.

{¶12} Barksdale's second assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION BY OVERRULING MR. BARKSDALE'S MOTION FOR CONTINUANCE TO COMPEL THE APPEARANCE OF TWO MATERIAL WITNESSES.

{¶13} Barksdale had subpoenaed two witnesses, Brendan Compton and James Luzinski, to testify at his trial about Quarterman's alleged drug and alcohol intoxication on the night of the assault. They did not appear and the trial court denied Barksdale's motion for a continuance in order to get them to appear. Barksdale argues that ruling was in error since those witnesses would have provided exculpatory and/or impeachment evidence.

{¶14} "The decision of whether to grant a continuance is a matter entrusted to the sound discretion of the trial court. *State v. Unger* (1981), 67 Ohio St.2d 65, syllabus. Therefore, a reviewing court will not reverse a trial court's decision to deny a motion for a continuance absent an abuse of discretion. *Id.* at 67. 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11

L.Ed.2d 921, quoted in *State v. Unger,* supra, at 67 Ohio St.2d 67." *State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 18.

{¶15} "Factors that a trial court must consider when ruling on a motion for a continuance include: (1) the length of the requested continuance; (2) any prior continuances; (3) the inconvenience to the litigants, witnesses, opposing counsel and the court; (4) reasons for the delay; (5) whether the defendant contributed to the delay; (6) and any other factors relevant to the unique facts of that case. *State v. Unger,* at 67-68; *State v. Landrum* (1990), 53 Ohio St.3d 107, 115." *Fairman* at ¶ 19.

{¶16} The trial transcript reflects the following exchange concerning Barksdale's attempt to obtain a continuance:

MR. WILMES:     Yes, Your Honor. I, at my client's insistence, issued subpoenas for Brenda Compton and I think a James Luzinski (phonetic). I understand they were duly served and have not appeared. Therefore, we'd ask for a continuance until they can be located and brought [in].

Now, in all candor, I would indicate that I've never talked with them, that we sent a private investigator out to try to find them and interview them at the Defendant's behest, and that he was unable to make the contact with them. So I'm not certain what they'll say, but I think Mr. Barksdale would indicate that at least one, or maybe both, will testify to the intoxicated drug induced state of the victim the night of the incident. I think that's what he's going to contend they would testify if they were here. Is that right?

THE DEFENDANT:     Yes.

MR. WILMES:     And for those reasons, her credibility would be

impeached. And for those reasons, we'd ask that the Court continue this trial until they can be located and brought in. Thank you.

THE COURT: Ms. Huber.

MS. HUBER: Thank you, Your Honor. The State would object to any continuance in this matter. This case has been pending since I believe the indictment was in March. The first we learned of the existence of these witnesses was last week. The State has received no information other than what was just stated, that they were even present the night of the evidence, or what have you. And it doesn't appear that anything they would have to add would go to any material issue of facts.

THE COURT: For the record, I'll ask the bailiff.

Ms. Peterson, you have checked the document, number one, and determined that those subpoenas were served on these individuals, correct?

THE BAILIFF: That's correct, Your Honor.

THE COURT: And you have made a check of the hallway and the surrounding areas here just momentarily ago, and they -- there is no one present by that name or that answers to that name, correct?

THE BAILIFF: That's correct, Your Honor.

THE COURT: Thank you very much.

The Court would overrule the motion to continue. We will proceed with the Defendant's case.

(Tr. 203-205.)

{¶17} Applying the *Unger* factors to this case, it does not appear that the trial court abused its discretion in denying Barksdale's motion for a continuance. The length of requested continuance seemed indefinite as it was unclear where and when the witnesses could be brought in to testify. There was some measure of inconvenience to the litigants, witnesses, opposing counsel, and the court as the state had rested its case and the jury was ready to hear the defendant's side. Barksdale had already requested and received two continuances prior to the commencement of trial. Moreover, it is uncertain how helpful their testimony would have been. Barksdale suggests they would have testified about Quarterman's intoxicated state. However, it is undisputed that no one witnessed the assault and Barksdale does not indicate that they would have offered any testimony that would have shed light on the altercation that took place between himself and Quarterman.

{¶18} Accordingly, Barksdale's second assignment of error is without merit.

{¶19} Barksdale's third assignment of error states:

THE TRIAL COURT SHOULD HAVE GIVEN A LIMITING INSTRUCTION ON MR. BARKSDALE'S PRIOR CONVICTIONS.

{¶20} Barksdale's trial counsel chose to be the first to address Barksdale's prior convictions, questioning him about them on direct examination:

Q    Before we go into that, we have to discuss whether you have a criminal record in the past 10 years, correct?

A    Yes, sir.

Q    And you do, do you not?

A    Yes, sir, I do.

Q    Basically, you've been convicted of petty theft, a misdemeanor in

2007, correct?

A    Yes, sir.

Q    And possession of crack cocaine, a felony of the fourth degree, on or about 2010.

A    Yes, sir.

Q    And abduction, a felony of the third degree, on or about 2006.

A    Yes, sir.

Q    And another possession of crack cocaine back in 2004, is that right?

A    Yes, sir.

Q    And finally, a possession of crack cocaine, which apparently is more than 10 years, but for which you're still on federal probation, correct?

A    Yes, sir. That's 14 years ago to be exactly (sic).

(Tr. 290.)

{¶21} When the assistant prosecuting attorney, Attorney Janna L. Huber, suggested a limiting instruction regarding Barksdale's prior convictions, Barksdale's trial counsel, Attorney J. Allen Wilmes, specifically objected to the jury receiving a limiting instruction about his past convictions and the trial court obliged:

THE COURT: Any objections?

MS. HUBER:      Do we need a (indiscernible) instruction? I don't know if it's in here. Do we need to put the instruction in about criminal convictions? It's what the purpose of the limitations of the criminal conviction. Isn't there –

MR. WILMES:        I don't know of one, and I would object to it.

THE COURT: No.

MS. HUBER:        I thought there was.

MR. WILMES:        Any undue importance to it.

MS. HUBER:        Okay. I'm just trying -- I'm just being very cautious.

THE COURT: I'm not going to enter it in at this point.

MS. HUBER:        Okay.

THE COURT: All right.

MR. WILMES:        So no objections. Thank you.

(Tr. 277.)

{¶22} Since Barksdale's trial counsel's stated position was that a limiting instruction not be given, he has waived all but plain error. *State v. Cochran*, 2d Dist. Champaign No. 09CA0024, 2010-Ohio-3444, ¶ 19.

{¶23} Despite his trial counsel's attempt to not give any "undue importance" to the convictions, Barksdale argues that the assistant prosecuting attorney did put "importance" on them in her cross-examination of him about them and in her closing argument.

{¶24} Assistant Prosecuting Attorney Janna L. Huber's cross-examination of Barksdale about his prior convictions went as follows:

Q        So now, you don't use drugs yourself?

A        No, ma'am. I've been –

Q        Okay.

A        -- drug free for 13 years now.

Q        But you'll give -- really?

A Yes.

Q Thirteen years?

A Thirteen years. Yes, ma'am, I have.

Q Okay. But you have a 2004 case for possession of crack cocaine.

A I had -- I was going to get some -- I picked up a 20-cent piece of cocaine for somebody. And when I come out the house, the police grabbed me and charged me with possession.

Q Okay. And you have a 2010 case for possession of crack cocaine?

A I was getting some cocaine for Linda Quarterman, and the police got me in 2010, which I just served a eight-month sentence for that, and which you are well aware of that. I was in your courtroom for what just -- for that.

Q Okay. And so, it's okay with you to buy drugs for other people but just not okay with you to use them?

A Well, it's not okay for -- to use or to buy. But I thought I was doing a deed for somebody at the time instead of-- and I was hurting them more than I was helping them, because Linda has a very –

MS. HUBER: Objection. It's non-responsive.

MR. WILMES: Let him -- he should be able to respond to this question if the question is relevant at all. And it's been opened.

THE COURT: The question, the far end?

MS. HUBER: Was if I think -- the question was is it okay for him to supply drugs to people but not to use them. And really, that requires a yes or no response.

THE WITNESS:      No.

BY MS. HUBER:

Q        And you also are a convicted thief. You were convicted of petty theft.

A        Yes.

Q        Okay. And you were also convicted of abducting someone.

A        Yes.

(Tr. 228-229.)

{¶25}  Her discussion of Barksdale's prior convictions in her closing argument went as follows:

So if you believe the Defendant, then you believe that Linda framed him, that this is a conspiracy, that she's mad at him. So if you believe that, this is what must be true. This is what must have happened if you believe the Defendant's story. That she had been upset and just waiting for the right opportunity to frame him, because either he wouldn't let her live in a house, or he didn't want to be with her, or she flattened his tires. I don't know. And that opportunity came when, according to him, the deacon at the church, the guy who didn't do any drugs that night, but everybody else around them did, and he gave them the money for it, if you believe that guy, the one, by the way, who has the possession of crack cocaine convictions, not once but twice, and three times, and abduction and theft -- if that's the guy that you believe, if that's who you pick, then you have to believe that she's begging this guy, who we know by his own admissions was cheating

with her, is a convicted felon, has a job that -- I guess a job that doesn't pay any money. The church just gives him offerings. That this is the guy that she's -- he's such a great catch that she's begging him to stay. Does that make sense? And that she's -- and we don't know what happened, because he tells us that she was fine when she (sic) left. So he wouldn't stay. He didn't want to be with her. So she's so angry and she's so upset that she picks up the phone and she calls 9-1-1, and she fakes that desperation in her voice, and she fakes an injury. And all the people in the background, they're faking it too. And then after she hangs up the phone with the police, she doesn't have a lot of time, so she's got to hurry up and break her nose. So she hurries up and she, somehow, breaks her nose. We don't know, because the Defendant said she was fine when he left. She was snorting more cocaine when she (sic) left.

(Tr. 263-264.)

**{¶26}** A review of the assistant prosecuting attorney's cross-examination of Barksdale about his prior convictions and her mention of them in her closing arguments does not demonstrate any error, let alone, plain error. The focus of the assistant prosecuting attorney's inquiry and her closing argument was entirely on Barksdale's credibility. The assistant prosecuting attorney was never trying to convince the jury to convict Barksdale because of bad character.

**{¶27}** Barksdale next argues that his trial counsel provided ineffective assistance of counsel by failing to request a limiting instruction prior to the jury receiving its instructions so that the limiting instruction could have been given in its appropriate place – in the middle of the jury instructions.

**{¶28}** To prove an allegation of ineffective assistance of counsel, a petitioner must satisfy a two-prong test: (1) counsel's performance fell below an objective standard of reasonable representation and (2) resulting prejudice. *;11341;11341Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Deficient performance means counsel's errors were so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999), citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show deficient performance prejudiced the defense, the defendant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, 42 Ohio St.3d 136, at paragraph three of the syllabus.

**{¶29}** When presenting an ineffective assistance of counsel claim, the petitioner has a difficult burden to overcome since in Ohio counsel is *presumed* to be competent. *Calhoun*, 86 Ohio St.3d at 289, 714 N.E.2d 905. "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.'" *State v. Few*, 2d Dist. Montgomery No. 25161, 2012-Ohio-5407, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶30}** "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Nabors,* 2d Dist. Montgomery No. 24582, 2012-Ohio-4757, ¶ 17, citing *State v. Mitchell,* 2d Dist. Montgomery

No. 21957, 2008-Ohio-493, ¶ 31. Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel. *State v. Carter,* 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965.

{¶31} This court has specifically held that failing to request a limiting instruction concerning a prior conviction does not constitute ineffective assistance of counsel. *State v. Bankston*, 2d Dist. Montgomery No. 24192, 2011-Ohio-6486, ¶ 28. "Courts have determined that 'debatable trial tactics do not constitute the ineffective assistance of counsel or plain error, and a competent attorney could reasonably choose not to seek a limiting instruction as a matter of trial strategy in order not to highlight [a defendant's] prior convictions.'" *Id*., citing *State v. Kinney,* 4th Dist. Ross No. 07CA2996, 2008-Ohio-4612.

{¶32} Accordingly, Barksdale's third assignment of error is without merit.

{¶33} Barksdale's fourth assignment of error states:

THE JURY'S VERDICT WAS AGAINST THE SUFFICIENCY AND WEIGHT OF THE EVIDENCE.

{¶34} Barksdale argues that Quarterman's and Craver's testimony was not credible and was inconsistent. For example, Barksdale points out that the police officer who responded to the incident found Quarterman on the floor in the fetal position, but she testified to beginning to clean herself up after Barksdale allegedly punched her and then went outside to get his license plate number. He also challenges the credibility of her testimony that she had only a few drinks when she acknowledged drinking from five to eleven o'clock that night and two bottles of liquor had been consumed by no more than four individuals.

{¶35} Barksdale argues that no photographs corroborated testimony concerning the layout of the house. He highlights Quarterman's testimony that she was aware of his other

girlfriend and that she was angry at him for it. Lastly, he states there was no medical documentation that Quarterman went to the emergency room or received treatment.

{¶36} Though ;1043;1043sufficiency and manifest ;1046;1046weight involve two different standards of review, they will be discussed ;1057;1057together for the sake of clarity and judicial economy and because both call for a review of the evidence, and because Barksdale essentially advances the same arguments in support of each.

{¶37} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict. *State v. Smith,* 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id*. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113, 684 N.E.2d 668.

{¶38} Alternatively, a weight-of-the-evidence challenge requires an appellate court to review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In assessing the credibility of the witnesses, the reviewing court is guided by the principle that the credibility of the witnesses is primarily the responsibility and province of the jury. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). This is because the jury is in the best position to assess the credibility of a trial witness based on its observations of the witness's demeanor, gestures, and voice inflections. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77,

80, 461 N.E.2d 1273 (1984). In reviewing all of the evidence, a weight-of-the-evidence challenge requires the reviewing court to determine if the greater amount of credible evidence supported the jury's finding of guilt. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶39} Reversal based on a successful weight-of-evidence challenge is reserved only for the exceptional case in which the evidence weighed so heavily against conviction that the jury clearly must have lost its way, creating a manifest miscarriage of justice. *Id*. Indeed, reversing on weight of the evidence after a jury trial is so extreme that it requires the unanimous vote of all three appellate judges rather than a mere majority vote. *Thompkins,* 78 Ohio St.3d at 389, 678 N.E.2d 541, citing Section 3(B)(3), Article IV of the Ohio Constitution (noting that the power of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses).

{¶40} In this case, the jury convicted Barksdale of felonious assault in violation of R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *."

{¶41} A rational trier of fact could have found beyond a reasonable doubt that Barksdale knowingly caused serious physical harm to Quarterman. The parties stipulated to the fact Quarterman suffered serious physical harm. (Tr 13-14.) Quarterman testified that she suffered that serious physical harm solely as a result of Barksdale punching her in the nose. (Tr. 135-136, 139.) Therefore, Barksdale's conviction for felonious assault was supported by sufficient evidence.

{¶42} Further, the greater amount of credible evidence supported the jury's finding of Barksdale's guilt. Quarterman's testimony combined with the circumstantial evidence

surrounding the incident supports this conclusion. Quarterman explained that the assault was precipitated by her having rebuffed his attempt to rekindle their romantic relationship:

> A      Ronnie [Barksdale] called me into the living room, and I sat down. At this time, she only [April Craver] had like a recliner chair and a TV. So I'm sitting on the edge of the recliner chair. So he asked me, he said was we going [to] get back together, or whatever, and I said no. And then he like, "I know you heard me." No. He said, "I know you seen my text and my voicemail asking you could I take you out to eat." And I said, "Well, I didn't respond to it." So I'm still sitting there on the edge of the couch.
>
> So he steady watching the game, and then he like, "I know one thing you ain't gonna be late for is your funeral, because I'm a put you there."
>
> Q      Okay. That's what he said.
>
> A      And then I -- that's when I stood up. Any by this time, he stood -- he's standing -- he stood up, and he punched me in the nose.

(Tr. 135.)

{¶43} When April Craver entered the living room to ask Barksdale for a cigarette she found Quarterman lying on the floor near the front door in a pool of blood. (Tr. 105, 110.) As Craver went to Quarterman's aid, she observed Barksdale say to Quarterman, "Bitch, let them clean you up. I gave you what you deserved." (Tr. 107.)

{¶44} Barksdale testified at length about the alcohol and drugs he observed Quarterman and the others consuming that night. Barksdale testified that immediately prior to the incident, Quarterman was the one who wanted to revive their romantic relationship and was jealous of another of his girlfriends. He suggested that as he was trying to leave the residence, the front door

may have hit Quarterman as she tried to prevent him from leaving. However, Barksdale's arguments under this assignment of error relate entirely to each respective party's credibility, a matter for which the jury was in the best position to assess and determine. It cannot be said that the jury clearly lost its way in this regard.

{¶45}  Accordingly, Barksdale's fourth assignment of error is without merit.

{¶46}  The judgment of the trial court is hereby affirmed.

. . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

(Hon. Gene Donofrio, Seventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Lucas W. Wilder
Hon. Timothy N. O'Connell