[Cite as *State v. Byrd*, 2014-Ohio-2553.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                              :

      Plaintiff-Appellee                         :          C.A. CASE NO.    25842

v.                                                                    :          T.C. NO.    13CR597

WILLIAM G. BYRD                                        :          (Criminal appeal from
                                                                                Common Pleas Court)

      Defendant-Appellant                      :

                                                                    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____13th____ day of ____June____, 2014.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 W. Second Street, Suite 706, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

      **{¶ 1}**  William G. Byrd was convicted after a jury trial in the Montgomery

County Court of Common Pleas of one count of attempted rape, a felony of the second degree. The trial court sentenced him to five years in prison and designated him a Tier III sex offender.

{¶ 2} Byrd raises four assignments of error, which we will address in an order that facilitates our analysis. For the following reasons, the trial court's judgment will be affirmed.

I. Manifest Weight of the Evidence

{¶ 3} Byrd's third assignment of error states that his "conviction is against the manifest weight of the evidence."

{¶ 4} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 5} Because the trier of fact sees and hears the witnesses at trial, we must defer

to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 6} According to the State's evidence at trial, in February 2013, T.C., the complainant, was fifteen years old. Byrd, who was twenty years old, was best friends with T.C.'s nineteen-year-old brother, Devin.

{¶ 7} In late December 2012, Byrd began staying with Devin at Devin's mother's house, because Byrd had nowhere else to live. Devin's mother permitted Byrd to sleep on the floor in Devin's room while Byrd saved money for an apartment, and Byrd was to contribute money toward the household while he stayed there. The situation was supposed to be temporary; Byrd did not have a key to the house and, in February 2013, there were plans for Byrd to leave that month.

{¶ 8} On the night of February 10-11, 2013, Devin's girlfriend spent the night at his house, and Byrd indicated that he would sleep in the living room to give them some privacy. Devin's bedroom was located on the first floor of the house, across the hall from T.C.'s room. The living room was also on the first floor.

{¶ 9} At approximately 3:00 a.m. on February 11, 2013, Byrd went into T.C.'s bedroom. Byrd got onto T.C.'s bed and started kissing her neck. He then took her wrist,

led her into the living room, sat her on the couch, and tried to kiss her again. T.C. turned her head and told Byrd that she "didn't want to do anything" with him. Byrd responded that he knew that T.C. thought he was cute, and he continued to try to kiss her. Byrd then stood up, lowered his jeans and boxer shorts, and stood in front of T.C. with an erect penis. Byrd then put his hand on the back of T.C.'s neck and tried to push his penis into her mouth. T.C. turned her head and repeated that she did not want to do anything with Byrd. Byrd told T.C. that he heard that T.C.'s "head game is good." T.C. did not know what that meant. She resisted and pulled back. Byrd pulled up his boxer shorts, sat down, and tried to kiss T.C. and touch her "all over." T.C. heard something from Devin's room, got up, and went to the kitchen. Byrd followed her, told T.C. to sit on his lap, and continued to touch "her ass." T.C. repeated that she did not want to "do anything" with Byrd. T.C. then retreated to her bedroom and locked the door. T.C. could not sleep; she sat on her bed until it was time to get ready for school.

{¶ 10} T.C. initially did not tell anyone what had occurred on February 11. Her mother had asked her to be nice to Byrd. In addition, T.C. "didn't want to break the peace in the house," and she "felt bad for" Byrd. T.C. testified that, after the incident, her relationship with Byrd was strained and she did not want to talk to him. T.C. acknowledged that she made cupcakes for Valentine's Day with Byrd, but claimed she was being nice.

{¶ 11} On the evening of February 18, 2013, T.C.'s mother returned from work at approximately 11:00 p.m. After she went to bed in an upstairs bedroom, she received a phone call from Byrd, asking to be let into the house to sleep. When T.C.'s mother let Byrd in, she could tell that he had been drinking. Byrd said that he was going to sleep in Devin's

room.

{¶ 12}   Shortly after returning to her bedroom, T.C.'s mother heard whispering in her room and saw Byrd walking toward her.  She "snapped [her] head back," and Byrd's mouth "was all over the side of [her] face, ear, neck, whatever."  She jumped out of bed and yelled, "What are you doing?  What are you doing?"  T.C.'s mother ran downstairs, repeatedly yelling at Byrd to "get out."  Byrd followed her downstairs, saying "I'm sorry" and "Please don't make me leave."

{¶ 13}   T.C.'s mother called to T.C. and told her (T.C.) that Byrd had come into her  (mother's) room.  T.C. was infuriated and tried to push past her mother.  When her mother asked her what was wrong, T.C. responded that Byrd had "tried the same thing" with her.  Byrd left the house, but paced back and forth on the driveway and repeatedly called T.C.'s mother's phone.  T.C.'s mother called Devin and asked him to come home.  By the time Devin arrived, Byrd had disappeared from the front yard.  T.C.'s mother soon received a text message from Byrd that he was going to commit suicide because he had nowhere to go.

{¶ 14}   T.C.'s mother contacted the police.  She reported that her son's friend (Byrd), who was staying at the house, had tried to "mess with me sexually," that she had told him to leave, and that Byrd had sent her a text message that he needed help and was going to kill himself.  T.C.'s mother mentioned that Byrd was on probation and that her daughter just told her that Byrd "had tried to mess with her about two weeks ago."  Huber Heights Police Officer Robert Bluma was dispatched at approximately 1:24 a.m. on a report of a "suicidal subject."  Officer Bluma located Byrd nearby.

{¶ 15} Once Byrd was secured in the cruiser, Officer Bluma went to T.C.'s home and spoke with T.C.'s mother, T.C., and Devin. At that time, T.C. told Officer Bluma what had occurred on February 11. After receiving statements from T.C. and her mother, Officer Bluma took Byrd to Miami Valley Hospital for evaluation. Officer Bluma also prepared a report and forwarded it to the detective section for further investigation.

{¶ 16} After Byrd was released from the hospital, he contacted Devin and asked for his clothing. When they met, Devin asked Byrd what had happened. Byrd said that he was a little drunk and kissed Devin's mom.

{¶ 17} At trial, Byrd testified on his own behalf and presented the testimony of his former girlfriend. His former girlfriend testified that she had dated Byrd for almost four years, that they broke up just before Valentine's Day in 2013, that she went to school with T.C., and that she was friends with Devin and T.C. Byrd's former girlfriend did not notice any changes in T.C.'s attitude toward Byrd in the week before February 18, 2013. She testified that, a couple of days after Byrd got out of the hospital in February, T.C. told her that Byrd had come into her (T.C.'s) room drunk and tried to force her (T.C.) to perform oral sex on him and that Byrd was "kissing and biting on her neck." T.C. did not tell Byrd's former girlfriend anything about going into the living room.

{¶ 18} Byrd testified that he had been living at Devin's home since December 2012. He testified that he had broken up with his long-time girlfriend about a week before February 18, 2013, and he was depressed. Consistent with T.C.'s mother's testimony, he acknowledged that he called T.C.'s mother in the early hours of February 18, went into the house, told her that he was going to sleep in Devin's room, but "went upstairs and * * * tried to kiss Devon's mom. I made an intoxicated mistake." Byrd described how he left the

house, sent the text message about being suicidal, and was located by the police. He testified that he called his former girlfriend from the cruiser and told her that he had made a mistake and tried to kiss Devin's mother. Byrd apologized to Devin when they met for Byrd to get his clothes.

{¶ 19} Byrd testified that he did not hear about T.C.'s allegations until March, when he was indicted. He denied that he had entered T.C.'s room, kissed her, exposed himself, and tried to force her to perform oral sex. Byrd testified that T.C.'s claims were "all false."

{¶ 20} On appeal, Byrd claims that his conviction is against the manifest weight of the evidence, because T.C.'s story is not believable. He emphasizes that Byrd allegedly took T.C. from her bedroom, a secluded location, to the living room, where they were more exposed. Byrd further notes that T.C. did not cry out for help at the time and did not make any allegations against him until a week later. T.C. made cupcakes with Byrd for Valentine's Day and gave him a card. Byrd admitted his actions toward T.C.'s mother, but denied any wrongful conduct regarding T.C.

{¶ 21} Upon review of the evidence, we cannot conclude that Byrd's conviction was against the manifest weight of the evidence. Byrd's conviction for attempted rape was based primarily on T.C.'s testimony regarding the events during the early morning hours of February 11, 2013. Byrd denied T.C.'s allegations and testified that her claims were false. The credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Considering all of the evidence presented at trial, the jury did not lose its way simply because it chose to believe T.C.'s version of events,

rather than Byrd's denial.

**{¶ 22}** Byrd's third assignment of error is overruled.

## II. "Other Acts" Evidence

**{¶ 23}** Byrd's first and second assignments of error both relate to the admission of testimony regarding Byrd's actions toward T.C.'s mother on February 18, 2013. They claim that (1) "the trial court committed plain error in allowing the other act evidence to be presented against Byrd," and (2) "the defendant was denied the effective assistance of counsel" when counsel did not object to the other acts evidence, did not request a limiting instruction, and did not object to the prosecutor's statements during closing argument regarding the other acts evidence.

**{¶ 24}** Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. * * *" R.C. 2945.59 similarly permits the admission of other-acts evidence tending to show a defendant's "motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question." *State v. Kirkland*, Slip Opinion No. 2014-Ohio-1966, ¶ 68.

**{¶ 25}** Generally, evidence of other acts is admissible if (1) it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), (2) it is relevant when offered for that purpose, Evid.R. 401, and (3) the danger of unfair prejudice does not substantially outweigh its probative

value, Evid.R. 403. *Kirkland* at ¶ 68, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

{¶ 26} A trial judge has considerable discretion to determine whether the specific evidence is of such a nature that it falls within one of the other purposes under Evid.R. 404(B) for which the evidence may be admitted. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. "Unless the trial court has 'clearly abused its discretion and the defendant has been materially prejudiced thereby, [appellate courts] should be slow to interfere' with the exercise of such discretion." *Kirkland* at ¶ 67, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 24. The supreme court has defined "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *Kirkland* at ¶ 67.

{¶ 27} Byrd's counsel did not object to the testimony regarding Byrd's sexual advances toward T.C.'s mother. Accordingly, we review its admission for plain error. Plain error may be noticed if a manifest injustice is demonstrated. Crim.R. 52(B); *State v. Lewis*, 2d Dist. Montgomery No. 23850, 2011-Ohio-1411, ¶ 54. In order to find a manifest miscarriage of justice, it must appear from the record as a whole that but for the error, the outcome of the trial clearly would have been otherwise. *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶ 28} The State claims that the testimony regarding Byrd's actions toward T.C.'s

mother on February 18 was admissible to explain why T.C. finally decided to reveal the assault by Byrd when she did. The record supports the State's assertion that the incident between Byrd and T.C.'s mother was introduced to explain why T.C. informed her mother and police officers on February 18, 2013 that Byrd had "messed with" her, and that the evidence was relevant for that purpose. During opening statements, the prosecutor informed the jury that T.C. initially did not tell anyone about Byrd's actions toward her and that "an interesting point in this case is how this all came to light" on February 18, 2013. After T.C.'s mother's testified to Byrd's conduct on February 18 and that she had ordered Byrd out of the house, she further described T.C.'s angry reaction to Byrd's conduct and T.C.'s statement that Byrd had acted similarly toward her. The State's closing argument discussed Byrd's actions toward T.C.'s mother as means of explaining "the way it [the attempted rape] came out." The State did not claim that Byrd's actions toward T.C.'s mother should be considered as proof that Byrd attempted to rape T.C. the previous week.

{¶ 29} The closer question is whether the danger of unfair prejudice substantially outweighed the probative value of the evidence regarding the February 18 incident. As Byrd notes in his appellate brief, T.C. and Byrd were the only witnesses to the alleged attempted rape, making the case against Byrd a matter of "he said/she said." Byrd asserts that the testimony regarding Byrd's advances toward T.C.'s mother created a substantial risk that the jury would conclude that Byrd had committed the attempted rape because he also made additional unwanted sexual advances toward T.C.'s mother a week later.

{¶ 30} It is apparent from the record that defense counsel incorporated the February 18 incident with T.C.'s mother into his defense strategy. Prior to opening statements,

defense counsel and the prosecutor stipulated that the 911 call would be admissible and admitted as Joint Exhibit 1. Counsel for both parties agreed that "either side might have some objections if the other side tried to play it as to whether it's an excited utterance or not, and * * * both are agreeing as far as trial strategy * * *that it comes in"; Byrd also expressed his approval. There was no request by defense counsel that the call be redacted.

{¶ 31} Defense counsel's opening statement reflected that Byrd's defense emphasized the delay in T.C.'s allegations, T.C.'s mother's statements and calm tone of voice in the 911 call, and T.C.'s conduct toward Byrd in the week between February 11 and February 18, 2013; this approach relied on the evidence of Byrd's conduct toward T.C.'s mother. Counsel described the events on February 18 and argued that the evidence would show that Byrd continued to live in the house between February 11 and 18, that he interacted with everyone in the house (including T.C.) and that "there was no indication of any problems whatsoever." Counsel emphasized that T.C. did not make any accusations against Byrd until Byrd made advances toward her mother.

{¶ 32} During the trial, defense counsel elicited testimony about T.C.'s behavior toward Byrd in the week between February 11 and 18, such as making cupcakes with him. In addition, there was substantial testimony that Byrd immediately acknowledged and apologized for his actions concerning T.C.'s mother when, in contrast, no mention was made of the alleged February 11 incident by Byrd or T.C. prior to February 18. When made aware of T.C.'s allegations, Byrd denied them. Defense counsel argued that T.C.'s delay in reporting the incident and her behavior in the week before the February 18 incident reflected that T.C.'s allegations were false. In summary, considering that defense counsel

incorporated the February 18 incident into his defense theory, we cannot conclude that the trial court committed plain error in allowing the State, without objection, to present that evidence.

{¶ 33} Moreover, the delay between the February 11 and 18 incidents and T.C.'s reasons for revealing the sexual assault a week later were significant issues in the case, particularly since there was evidence that T.C. had acted normally toward Byrd in the week following the attempted rape, such as by making cupcakes with him on February 13 and giving him a Valentine's Day card. On the other hand, the evidence of Byrd's conduct with T.C.'s mother was prejudicial to Byrd in that it displayed additional unwanted advances. Even if the unfair prejudicial impact outweighed the probative value of this line of questioning, we cannot conclude that the prejudicial nature of the testimony regarding Byrd's conduct toward T.C.'s mother on February 18 outweighed the probative value to such a degree that the trial court committed plain error in permitting the State to present it.

{¶ 34} Byrd asserts that his defense counsel rendered ineffective assistance by allowing the admission of evidence of Byrd's sexual advances on T.C.'s mother without objection or a request for a limiting instruction and in failing to object to the prosecutor's closing argument regarding that evidence.

{¶ 35} To reverse a conviction based on ineffective assistance of counsel, an appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42

Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 58.

{¶ 36} As discussed above, defense counsel's decision not to object to the testimony regarding the February 18 incident was a reasonable decision concerning trial strategy. Byrd has not demonstrated that his trial counsel acted deficiently.

{¶ 37} Byrd further complains that his trial counsel should have requested a limiting instruction that the "other acts" evidence regarding T.C.'s mother could not be considered in determining whether Byrd attempted to rape T.C.[1] Failing to request a limiting instruction concerning a prior conviction does not automatically constitute ineffective assistance of counsel. *State v. May*, 2d Dist. Montgomery No. 25359, 2014-Ohio-1542, ¶ 18; *State v. Barksdale*, 2d Dist. Montgomery No. 25320, 2013-Ohio-2926, ¶ 31; *State v. Bankston*, 2d Dist. Montgomery No. 24192, 2011-Ohio-6486, ¶ 28. The same holds true for "other acts" evidence that does not involve a conviction. Considering that the State repeatedly stated that Bryd's advances toward

---

[1] During Byrd's testimony, he acknowledged that he was on probation for a misdemeanor petty theft when the instant offense occurred in February 2013. The court's jury instructions included an instruction that the evidence of Byrd's prior conviction was received for a limited purpose and could be considered only for the purpose of testing Byrd's credibility and the weight to be given to his testimony. No similar instruction was given regarding Byrd's actions toward T.C.'s mother.

T.C.'s mother explained why T.C. told her mother and police about the attempted rape when she did and the prosecutor expressly told the jury that it could not consider that evidence to prove that the attempted rape occurred (*see*, *e.g.*, ¶ 38, infra), we cannot conclude that the outcome of Byrd's trial would have been different had this limiting instruction been given.

{¶ 38}  Finally, Byrd asserts that his trial counsel should have objected to the prosecutor's comment during closing argument regarding the "other acts" evidence. Specifically, Byrd complains about the following statement:

> And what's even more disgusting about this is the way it came out, because we know a week later, on the 18[th], what does he do?  He comes back to the house, and they had had somewhat of a normal week.  And we'll talk more about that.  *But he then tries to make advances on [T.C.'s mother]. Now I am telling you straight up you are not to consider that as evidence that he did what he did against [T.C.], but it is a piece of the puzzle, and it does show the kind of person we're dealing with here.*

(Emphasis added.)

{¶ 39}  In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant.  *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000).  The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor.  *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).  Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been

prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 40}** There was nothing improper about the prosecutor's statement that the jury was not to consider the sexual advances on T.C.'s mother as evidence that he committed the attempted rape. Indeed, this statement is akin to the limiting instruction that Byrd states that the trial court should have given. Nor was there anything improper in the prosecutor saying that Byrd's actions on February 18 "were a piece of the puzzle." The prosecutor's next statement that Byrd's actions "show the kind of person we're dealing with here" (and, impliedly, that he acted "in conformity therewith") was improper, but we do not find this isolated statement affected the outcome of Byrd's trial. Byrd's counsel did not render ineffective assistance based on his failure to object to this single statement.

**{¶ 41}** Byrd's first and second assignments of error are overruled.

### III. Sentencing

**{¶ 42}** In his fourth assignment of error, Byrd claims that "the trial judge abused her discretion in sentencing Byrd."

**{¶ 43}** "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences. * * * However, the trial court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C.

2929.12." (Citations omitted) *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.).

**{¶ 44}** "In *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 (2d Dist.), we held that we would no longer use an abuse-of-discretion standard in reviewing a sentence in a criminal case, but would apply the standard of review set forth in R.C. 2953.08(G)(2). Since then, opinions from this court have expressed reservations from some judges of this court whether that decision in *Rodeffer* is correct. *See*, *e.g.*, *State v. Garcia*, 2d Dist. Greene No. 2013-CA-51, 2014-Ohio-1538, ¶ 9, fn.1." *State v. Johnson*, 2d Dist. Clark No. 2013-CA-85, 2014-Ohio-2308, ¶ 9, fn.1. In the case before us, we find no error in the sentence imposed under either standard of review.

**{¶ 45}** Byrd was convicted of a second-degree felony, which has a sentencing range of two to eight years in prison. The trial court sentenced Byrd to five years in prison. Byrd does not claim that this sentence is contrary to law but, instead, that his actions toward T.C. did not warrant a five-year sentence. He emphasizes that T.C. testified that his attempt to get her to perform oral sex on him lasted for a couple of seconds and he did not make another attempt to rape her.

**{¶ 46}** In imposing sentence, the trial court recognized that this case was Byrd's first felony conviction as an adult, but noted that it was sexual in nature and involved a minor (although the sexual nature is inherent in the charged offense and should not be an "aggravating" factor). The court found that Byrd assumed no responsibility for his actions. In his statements to the court, Byrd professed his innocence, and he had told the presentence investigator that T.C. had flirted with him and "made these allegations up because she was

upset he was attracted to her mother and not her." The court also considered the fact that Byrd had made unsolicited sexual advances toward T.C.'s mother shortly after the assault on T.C. Byrd was on probation for a misdemeanor offense when the attempted rape was committed. Based on our review of the record, we conclude that the trial court did not abuse its discretion when it imposed five years for the attempted rape.

{¶ 47} Byrd's fourth assignment of error is overruled.

IV. Conclusion

{¶ 48} The trial court's judgment will be affirmed.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Andrew T. French
Robert Alan Brenner
Hon. Barbara P. Gorman